**AURIEL DEVON FRETT, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

Consolidated Cases: S. Ct. Criminal Nos. 2011-0053; 2011-0064

Supreme Court of the Virgin Islands

June 20, 2013

DOLACE MCLEAN, ESQ., VISIONS Law Firm, St. Thomas, USVI, *Attorney for Appellant*.

PAUL J. PAQUIN, ESQ., Deputy Solicitor General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(June 20, 2013)

■ HODGE, *Chief Justice.* Auriel Devon Frett appeals[1] from a September 20, 2011[2] Judgment and Commitment issued by the Superior Court of the Virgin Islands. Frett was adjudged guilty of a number of offenses, including first-degree murder, and the court sentenced him to life imprisonment without the possibility of parole, among other punishments. Frett raises several challenges to his convictions. We conclude that the trial court committed reversible error by permitting a suppressed statement to be used as substantive evidence of Frett's guilt, and thus we vacate his convictions and remand for a new trial.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

Gabriel Lerner, a judicial law clerk for the Superior Court of the Virgin Islands, disappeared on October 26, 2008. Calls to his phone went unanswered and when he did not report to work on October 27 and October 28, 2008, his supervisor, Judge Brenda Hollar, grew concerned. She requested the assistance of the Superior Court Marshals and the Virgin Islands Police Department to locate Lerner. (J.A. 122-28.) They

---

[1] The People filed a Notice of Appeal in S. Ct. Crim. No. 2011-0064, which was consolidated with this case, indicating their intent to cross-appeal the trial court's rulings on Frett's firearms charges. However, they have not briefed any of the issues they purportedly wished to appeal and so have waived them all. V.I.S.CT.R. 22(m) ("Issues that were . . . raised or objected to but not briefed . . . are deemed waived for purposes of appeal . . . ."); *Williams v. People*, 56 V.I. 821, 826 n.5 (V.I. 2012); *Dowdye v. People*, 55 V.I. 736, 751 n.13 (V.I. 2011) (holding "an appellant [must] raise an issue in his opening brief or else waive the issue on appeal").

[2] The Superior Court judge signed the Judgment and Commitment on August 17, 2011, but it was not entered by the Clerk of that court until September 20, 2011. For this Court's purposes, the relevant date is the date of entry of the order or judgment — which constitutes the date on which it was issued — and not the date on which it was signed. *See* V.I.S.CT.R. 5(b)(1) and 5(b)(6).

went to Lerner's home but neither he nor his car was there. Moments after the VIPD issued an "All Points Bulletin" for Lerner's vehicle, Officer Jose Allen called police dispatch to report that he had just seen the maroon-colored Ford vehicle in the area of Estate Contant. (J.A. 128.) Detective Allen began to pursue the vehicle, which was accelerating away from him. (J.A. 143, 366.)

Eventually, while Lerner's car was proceeding down a hill, it collided with a marked police vehicle. (J.A. 146, 368.) Two men exited the vehicle and ran into the bush on the side of the road and Detective Allen identified the driver as Frett. (J.A. 147, 369.) Police searched the area for more than three hours, attempting to find the suspects, before the search was suspended for a short time. (J.A. 158.) Fifteen minutes to a half an hour later, the law enforcement officers resumed their search and located and apprehended John Southwell — a seventeen-year old[3] — and Frett. (J.A. 198, 223, 226.)

Upon taking the men into custody, the police separated them and asked Southwell to give a statement. Southwell's mother was present and she urged him to tell the police what he knew. (J.A. 436.) He gave a statement informing the police that Frett had shot and killed Lerner. (J.A. 374, 436.) Southwell also accompanied the police to Estate Bordeaux and showed them where Lerner's body was located. (J.A. 355, 376.) An autopsy revealed that Lerner died of a gunshot wound to the back of his head. (J.A. 287.) Southwell also told the police that they could locate Lerner's identification and credit cards near the Midtown Guest House (J.A. 375), and based on his statement, the police did find the items in the gutter in the area near Midtown Guest House where Frett was staying. (J.A. 297-98, 524.)

Frett, on the other hand, initially signed a *Miranda* warnings acknowledgement and waiver concerning his constitutional rights at 6:42 p.m. on October 28, 2008, but subsequently invoked his right to an attorney when he was questioned by police. (J.A. 909.) After he did so, the interrogation ceased. However, hours later a detective told Frett that Southwell had given a statement that blamed Frett for Lerner's death.

---

[3] Pursuant to Rule 15(c)(2) of the Virgin Islands Supreme Court Rules, the names of minor children are typically required to be redacted from any publicly filed documents, including Court opinions, and replaced with initials. However, because Southwell was tried and convicted as an adult, rather than a minor, we will use his name throughout this Opinion.

(J.A. 910.) Upon hearing this, Frett indicated his desire to make a statement of his own, signed another *Miranda* warnings acknowledgement and waiver at 10:03 p.m., and then gave the police a written statement.[4] (J.A. 556, 563, 622.) Frett's statement indicates that he and Southwell received a ride from a "white boy" in the area of Cassi Hill. He indicated that the "white boy" told them that that he worked for Judge Hollar, at which time Southwell said that his friend was currently under house arrest on Judge Hollar's orders. (J.A. 577-78.) A day after his arrest, Frett attended his first appearance before the court. At that time, the Office of the Public Defender appeared on his behalf but promptly sought leave from the court to withdraw as Frett's counsel, which the court granted.[5] A private attorney was appointed to represent him.

On September 20, 2010, Southwell pleaded guilty to second-degree murder and first-degree robbery. (J.A. 377.) As part of the plea agreement, Southwell agreed to testify against Frett. (J.A. 378.) The People agreed to recommend as his sentence twenty years of incarceration for the murder and fifteen years for the robbery. (J.A. 377.)

Before trial, Frett moved to suppress his October 28, 2008 statement on the grounds that it was obtained in violation of his right to counsel. He argued that he gave the statement after having already invoked his right to speak to an attorney and in response to the police's continued interrogation. On February 23, 2011, after a hearing on the motion, the court issued a Memorandum Opinion and an Order granting Frett's suppression request. (J.A. 907-14.) The court determined that the statement was made in response to an unlawful interrogation that

---

[4] Frett was required to include in the Appendix "relevant portions of the trial transcripts, exhibit or other parts of the record referred to in the briefs . . . ." V.I.S.CT.R. 24(a). However, he failed to include in the Joint Appendix perhaps the most important exhibit for this appeal: a copy of his October 28, 2008 statement, the admission of which serves as the basis for his most forceful argument. His failure to do so could have jeopardized his appeal, because, as discussed below, the major issue for this Court to decide is whether the admission of the statement for substantive purposes constituted "harmless error." V.I.S.CT.R. 4(i). It is difficult to perform this analysis without the statement itself. Consequently, the Court itself was required to obtain the Exhibit from the Clerk of the Superior Court. V.I.S.CT.R. 11(c).

[5] Although Frett failed to provide us with the transcript of the appearance, he represents to the Court that the Office moved to withdraw because Lerner was a member of the Virgin Islands Bar, and the Office did not believe they could provide impartial representation. Since he has not raised this issue on appeal, we decline to determine whether this represented a valid reason to disqualify every attorney in the Office from representing Frett.

followed Frett's request for an attorney, and thus violated *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). However, referencing the Federal Rules of Evidence, the court made clear that the statement could be used for impeachment purposes if Frett testified at trial. (J.A. 914.)

The trial began on February 28, 2011. Southwell took the stand as a witness for the People. He testified that he met Frett at Midtown Guest House on the morning of October 26, 2008, because they were supposed to go together to St. John. (J.A. 325-26.) They took public transportation until they came to an intersection where they exited the vehicle. At that time, Lerner drove by, on his way to attend a Bible study at a beach near the north-east end of the island. (J.A. 327.) He stopped when he saw the men and offered them a ride to Red Hook. (J.A. 327.) They drove past Lerner's destination and, according to Southwell, when they had arrived in the area of Sapphire Beach, Frett asked Lerner to stop the vehicle so he could get out to urinate, which he did. (J.A. 327.) When Frett returned to the car, he had a handgun in his hands. (J.A. 329.) He asked Lerner if he had ever been robbed, and when Lerner asked, "Why? Are you robbing me?" Frett responded in the affirmative. (J.A. 330.) Lerner handed Frett his wallet and Frett ordered Lerner to get into the backseat of car. (J.A. 330.)

Southwell testified that he and Frett then took Lerner to the Friendly Grocery Store on the north side of the island. (J.A. 330.) While Lerner was still alone in the car, they attempted to use his credit cards at the store to purchase gas and other items. (J.A. 331.) A man resembling Frett was identified on the store's video surveillance system getting out of Lerner's car and coming into the store.[6] (J.A. 268, 332.) During their time in the store, Southwell and Frett repeatedly looked out the window to ensure that Lerner was still in the vehicle, and Frett went out to the car at least once. (J.A. 338-39.)

After leaving the grocery store, Frett and Southwell drove towards Hull Bay and pulled into a private driveway. (J.A. 340.) According to Southwell, Frett asked Southwell to open the trunk of the vehicle, which he did, and then Frett forced Lerner into the trunk. (J.A. 341.) They drove

---

[6] During his testimony on direct examination, Southwell viewed the surveillance video tape from the store and identified Frett as the driver of Lerner's vehicle.

to the west end of St. Thomas in Estate Bordeaux, and drove onto a dirt pathway. (J.A. 345.) After parking the car, Frett removed Lerner from the trunk and forced him to walk up the trail. (J.A. 345.) Southwell testified that they walked for less than five minutes on the trail, and Frett mentioned once or twice that there could be no witnesses. (J.A. 347.) Lerner turned around and asked Frett if he was going to kill him. (J.A. 350.) Frett told Lerner to shut up and turn around, and then Frett fired one shot at Lerner, killing him. (J.A. 350.) Frett and Southwell then ran to the car, and Frett drove away. (J.A. 352.)

After leaving Lerner's body in Estate Bordeaux, Frett and Southwell returned to Friendly Grocery Store to purchase items to use to clean Lerner's car. (J.A. 356-57.) They went to "Western Auto"[7] to purchase tint, and tinted the windows of Lerner's car, which took about an hour and a half, then spent some time with Frett's friend, Carlos, before returning to their homes. (J.A 358-59, 363.)

Southwell admitted on the stand that he had received a plea agreement in exchange for his testimony, and had received a sentence of twenty years for second-degree murder and ten years for first-degree robbery.

Frett's trial testimony, however, contradicted Southwell's. Frett testified that Southwell came to Midtown Guest House in the morning of October 26, 2008, and discussed places they might hang out that night. (J.A. 529.) Frett protested that he did not have much money and, anyway, did not have a car. (J.A. 529.) According to Frett, Southwell said, "Don't worry about a ride. I have a ride," and he pointed to Lerner's vehicle, explaining that he had had the vehicle for about two weeks. (J.A. 529.) The men left the guest house and went to the Friendly Grocery Store. (J.A. 531.) When asked if Lerner was in the car with them, Frett testified that he was not in the car. (J.A. 531.) Frett said that Southwell went into the store first but came out and asked Frett to sign the credit card for him, because the cashier did not want to deal with Southwell. (J.A. 533.) Frett indicated that Southwell had told him that he had been lent the credit card by a friend. (J.A. 533.) When asked about the video surveillance tape that showed him repeatedly looking back into the gas station lot, Frett said that he looked back because a woman was honking her horn and trying to get

---

[7] Although Southwell identified the store as "Western Auto" — the name by which it is commonly identified in St. Thomas — the actual name of the store is "Advance Auto Parts," as displayed on the defendants' receipt. (J.A. 361.)

their attention so that they would move their car out of the way of the pump. (J.A. 533.)

According to Frett, after the men left the convenience store, they returned to town. (J.A. 535.) However, Southwell then realized that he had forgotten to purchase tint for the car, so they returned to the store. (J.A. 535.) However, the store did not sell tint, so they proceeded to Advance Auto Parts. (J.A. 535.) After purchasing the tint, they brought the car to a lot behind the Medical Arts Complex and tinted it. (J.A. 536.) Southwell took Frett back to the guest house when they were done, and did not return until the following morning. (J.A. 536.) Frett testified that on Tuesday, when the police started chasing their vehicle, it was Southwell's idea not to stop, reminding Frett that he was "illegal" and would go to jail. (J.A. 541.)

On cross-examination, the People confronted Frett with his October 26, 2008 statement. The People indicated that they would be proceeding "under title 14, [s]ection 19, prior inconsistent statement." (J.A. 566.) Frett acknowledged that his signature appeared to be on the statement, but denied ever having given the statement. (J.A. 556.) In his statement, Frett indicated that he and Southwell had received a ride from Lerner on October 26, 2008, on their way to Red Hook, which contradicted his trial testimony. (J.A. 577.) In his statement, Frett also said that Lerner had told the men he worked for Judge Hollar and that Southwell then noted that one of his friends was on house arrest on orders from Judge Hollar. (J.A. 578.) Frett's statement goes on to say that Southwell drove back to town and dropped Frett off at the guest house. (J.A. 586.) Two hours later, according to the statement, Southwell returned to the guest house without Lerner and when Frett asked where Lerner was, Southwell said he was "history," and admitted to killing Lerner. (J.A. 586.) However, once on the stand, Frett denied telling the police that he had ever been in the car with Lerner and denied making the statement. (J.A. 581.) He also said he did not know who killed Lerner. (J.A. 589.)

The People moved for the admission of Frett's October 28, 2008 statement. The court ruled that the statement would be admissible as substantive evidence under section 19 of title 14 of the Virgin Islands Code. (J.A. 507.) Frett objected, stating that he did not believe section 19 provided for its admissibility as substantive evidence but only, if anything, for impeachment purposes. (J.A. 508-09.) The court stated that it would research the issue and would revisit the ruling. (J.A. 509.) When

the People sought to admit the statement during Frett's testimony, Frett objected, arguing that section 19 preceded *Miranda* and its progeny, and to admit the statement as substantive evidence would violate his due process rights. (J.A. 567.) The court permitted the statement to be admitted as substantive evidence and allowed the jury to take the statement into their deliberations. During their closing address to the jury, the People argued that the statement was consistent in important ways with Southwell's statement, constituting an admission that Frett had been with Lerner on the morning of his murder. (J.A. 721-22; J.A. 744-45.)

On March 2, 2011, at the close of the People's case-in-chief, Frett moved pursuant to Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal on the firearms offenses, and he also moved to dismiss the remaining offenses. (J.A. 511.) The court denied Frett's motions. At the close of all of the evidence on March 3, 2011, Frett renewed his Rule 29 motion. (J.A. 663.) The court denied the motion as to all but the firearms offenses, which it took under advisement. (J.A. 676.)

The jury found Frett guilty of all charges. After the trial, Frett filed a renewed motion pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, arguing in part that the admission of Frett's inconsistent statement as substantive evidence was improper because it was a statement that had been suppressed pursuant to *Miranda*. In an Opinion dated July 12, 2011, the Superior Court granted the Rule 29 motion as to the firearms charges but denied it as to Frett's other arguments. (J.A. 22-37.) The court issued its Judgment and Commitment on September 20, 2011, sentencing Frett to life in prison on Count I, ten years imprisonment on Count III, and thirty-five years imprisonment on Count V, with the sentences to run concurrently.[8] (J.A. 18-19.) Frett filed his timely Notice of Appeal on July 20, 2011.[9]

---

[8] Frett had been charged in Count I with first-degree murder; Count III, with first-degree assault; Count V, kidnapping for robbery; and in Count VII, with reckless endangerment. In Counts II, IV, and VI, he was charged with the associated firearms offenses.

[9] "A notice of appeal filed after the announcement of an order or judgment, but before the entry of a writing memorializing the same, is treated as filed on the date of and after such entry . . . and is considered timely filed." *Potter v. People*, 56 V.I. 779, 787 n.10 (V.I. 2012) (internal quotation marks omitted). *See also* V.I.S.Ct.R. 5(b)(1).

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4, § 32(a). Because the Superior Court's September 20, 2011 Judgment and Commitment is a final judgment, this Court has jurisdiction to consider Frett's appeal. *See, e.g., Browne v. People*, 56 V.I. 207, 216 (V.I. 2012) (stating that in a criminal case, a written judgment embodying the adjudication of guilt and the sentence imposed based on that adjudication constitutes a final judgment for purposes of 4 V.I.C. § 32(a)); *Melendez v. People*, 56 V.I. 244, 251 (V.I. 2012) (same).

We review the Superior Court's factual findings for clear error and exercise plenary review over the Superior Court's application of the law to those facts. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007); *see also People v. John*, 52 V.I. 247, 255 (V.I. 2009) (quoting *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006)), *aff'd*, 654 F.3d 412, 55 V.I. 1324 (3d Cir. 2011). Where an appellant fails to object to a Superior Court order or decision, we review for plain error. V.I.S.CT.R. 4(h); *Phipps v. People*, 54 V.I. 543, 546 (V.I. 2011).

### B. Use of Frett's Suppressed Statement as Substantive Evidence

Frett's main argument on appeal concerns the trial court's admission of his October 28, 2008 statement as substantive evidence of his guilt. Five days before the trial began, the court issued an Order granting Frett's motion to suppress the statement on the grounds that the police obtained the statement in violation of *Miranda*. At trial, however, over Frett's objections, the statement was used as substantive proof.[10] The court noted

---

[10] The trial court never expressly ruled that the statement could be used as substantive evidence, but it never explicitly stated that it could be used only for impeachment purposes either. The court's colloquies with counsel only serve to confuse the matter further. (J.A. 32, 33, 506, 507, 567, 617, 681, 692, 802, 803.) At times, the court appeared to limit the use of the statement to its impeachment purpose. (J.A. 32, 506, 567.) At other times, it appeared to believe that the statement could be used as substantive evidence pursuant to section 19 of title 14. (J.A. 33 (noting the dual purposes for which non-suppressed prior inconsistent statements may be used; J.A. 507 ("[The jurors are] the ones who determine which statement is

that section 19 of title 14 permitted prior inconsistent statements to be used as substantive evidence. (J.A. 33, 617.) After the trial concluded, as part of its order denying in part Frett's post-trial motions, the court again stated that prior inconsistent statements can be used for impeachment purposes. (J.A. 33 ("[P]ursuant to Title 14 V.I.C. § 19, Defendant's Second Statement is admissible for the 'purpose of affecting the credibility of the witness or for proving the truth of the matter asserted therein if it would have been admissible if made by the witness at the hearing or trial.' " (quoting 14 V.I.C. § 19)).)

Section 19 of title 14 provides in relevant part that

> [e]vidence of a prior statement, oral or written, made by a witness is not made inadmissible by the hearsay rule if the prior statement is inconsistent with his testimony at a hearing or trial. . . . Such prior statement shall be admissible for the purpose of affecting the credibility of the witness or for proving the truth of the matter asserted therein if it would have been admissible if made by the witness at the hearing or trial.

14 V.I.C. § 19. It is clear that notwithstanding the hearsay rule, section 19

---

true."); J.A. 614 ("[Section 19] goes beyond impeachment.").) In the end, the court denied the defendant's motion for an instruction that the statement had been suppressed, ruling that "the suppression issue is one that is procedural, rather than substantive and therefore, the very virtue of the Defendant taking the stand is an issue procedurally and not that of a substantive right." (J.A. 802.)

Nonetheless, even without an explicit ruling from the trial court, we are able to conclude that the statement was in fact used by the People as substantive evidence. First, although a general instruction was given on inconsistent statements as they relate to credibility, the court never gave a limiting instruction specifically addressing Frett's prior inconsistent statement and restricting its use to impeachment. Second, the statement was physically provided to the jury for use during their deliberations. Third, during their closing argument, the People repeatedly emphasized the statement's similarities to Southwell's testimony. (J.A. 721-22; J.A. 744-45.) This tactic did not highlight Frett's inconsistent testimony on the stand, but instead asked the jury to find that the prior inconsistent statement itself was true because it was so similar to Southwell's statement. *See Ellis v. State*, 622 So.2d 991, 996 (Fla. 1992) (concluding that the state had used a previous statement as substantive, rather than impeachment, evidence in part because the prosecutor had emphasized the truthfulness of the prior statement). Finally, counsel for the People readily conceded during oral argument before this Court that the statement was used as substantive evidence. For these reasons, we find that the statement was used not just to impeach Frett, but as substantive evidence of his guilt.

503

generally permits prior statements to be used as substantive evidence to prove the truth of the matter stated.[11]

The colloquies during the trial, and the People's brief and argument on appeal, indicate that both the court and the parties conflated admissibility for the purposes of hearsay with admissibility generally. (J.A. 613, 615, 646, 647, 686, 802; Appellee's Br. 6-11.) The hearsay prohibition is just one obstacle to the use of evidence for substantive purposes; even if Frett's statement satisfied the hearsay exception in section 19, and even if that section survived the 2010 repeal of the Uniform Rules of Evidence and the ensuing adoption of the Federal Rules of Evidence — a question we do not reach — the statement must still be otherwise admissible. 14 V.I.C. § 19 (noting that prior inconsistent statements are "not made inadmissible *by the hearsay rule*") (emphasis added).

 It is black letter law that a statement obtained in violation of a defendant's right to counsel, and subsequently suppressed, may not be used as substantive evidence and instead can only be used, if at all, to challenge the credibility of the witness. *See Michigan v. Harvey*, 494 U.S. 344, 350, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990) (stating that evidence secured during a police-initiated conversation occurring after the defendant has invoked his Fifth Amendment rights is inadmissible as substantive evidence, but is admissible to impeach the defendant's inconsistent trial testimony); *Harris v. New York*, 401 U.S. 222, 226, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1970) (indicating that a statement obtained in violation of *Miranda* could be used for impeachment purposes only).[12]

---

[11] We do not reach the question raised below — but not presented by Frett on appeal — of whether section 19 survives the Legislature's repeal of the Uniform Rules of Evidence and adoption of the Federal Rules of Evidence, which specifically prohibit the use of prior inconsistent statements as substantive evidence unless the previous statement was given under oath, pursuant to Rule 801(d)(1)(A). *See* Act No. 7161, § 15 (V.I. Reg. Sess. 2010); *see also* FED. R. EVID. 801(d)(1)(A). Section 19 is not implicated in this appeal because, first, the statement — as an admission by a party opponent — would not have been considered hearsay under Rule 801(d)(2)(A), and second, on appeal the dispositive issue is whether the admission of suppressed testimony as substantive evidence violates Frett's constitutional rights.

[12] As the United States Supreme Court observed in *Kansas v. Ventris*, 556 U.S. 586, 590, 129 S. Ct. 1841, 173 L. Ed. 2d 801 (2009), "[w]hether otherwise excluded evidence can be admitted for purposes of impeachment depends upon the nature of the constitutional guarantee that is violated. Sometimes that explicitly mandates exclusion from trial, and sometimes it does not." For example, coerced statements are never admissible at trial for any

Here, it is clear that the trial court found that the prior statement had been obtained in violation of Frett's *Miranda* rights, and thus must be suppressed.[13] Consequently, it should not have been admitted for substantive purposes.

■ It is not entirely clear why the trial court permitted the evidence it had previously suppressed to be used as substantive evidence, in contravention of existing law. In its ruling, the court explained that "the suppression issue is procedural, rather than substantive and therefore, the very virtue of the Defendant taking the stand is an issue procedurally and not that of a substantive right." (J.A. 802.) Similarly, in denying in part Frett's post-trial motions, the court focused on the distinction between

---

purpose. *Ventris*, 556 U.S. at 590 (citing *New Jersey v. Portash*, 440 U.S. 450, 458-59, 99 S. Ct. 1292, 59 L. Ed. 2d 501 (1979)); *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) ("*[A]ny* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law"); *see also Simpson v. United States*, 632 A.2d 374, 380-82 (D.C. 1993) (rejecting the impeachment use of involuntary statements). On the other hand, statements obtained as a result of police-initiated interrogations occurring after a defendant has invoked his Fifth or Sixth Amendment rights to counsel may be used for impeachment purposes. *Harris*, 401 U.S. at 225-26; *Harvey*, 494 U.S. at 351-53. This is because the courts have weighed the interest in finding the truth in a criminal case against the " 'speculative possibility' " that exclusion will deter unconstitutional behavior by the police in the future, and have concluded that the risk of "allowing perjurious statements to go unchallenged" in such circumstances is too great. *Ventris*, 556 U.S. at 591, 593-94. However, it has been clear for more than half a century that the substantive use of statements taken in violation of the right to counsel is "outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men." *Walder v. United States*, 347 U.S. 62, 65, 74 S. Ct. 354, 98 L. Ed. 503 (1954).

[13] Because the Court may not reverse if the trial court's errors were merely harmless, V.I.S.Ct.R. 4(i), it is proper to review the trial court's ruling that Frett's statement was taken in violation of his right to counsel and that its suppression was required by the exclusionary rule. We conclude that the statement was properly suppressed. The uncontroverted evidence at the suppression hearing indicated that during his interrogation on the night of his arrest, Frett requested a lawyer. (J.A. 909.) At that time, interrogation ceased. However, hours later, a detective resumed the questioning after telling Frett that Southwell had given a statement and had blamed Frett for Lerner's death. (J.A. 910.) The question before the trial court was whether that action by the police constituted an "interrogation" for the purposes of *Miranda*. Reviewing for clear error, *People v. John*, 52 V.I. 247, 255 (V.I. 2009) (quoting *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006)), *aff'd*, 654 F.3d 412, 55 V.I. 1324 (3d Cir. 2011), we conclude that the trial court did not clearly err when it determined that the police's conduct was reasonably likely to elicit a statement from Frett. *See Nelson v. Fulcomer*, 911 F.2d 928, 933-34 (3d Cir. 1990) (noting that it constitutes an interrogation for the police to ask an accomplice to tell the suspect that the accomplice had confessed, because such an action was "reasonably likely to elicit" inculpatory statements from the suspect) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301-02, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)).

procedural and substantive rights. (J.A. 31-32.) The People repeated this distinction during their oral argument, suggesting that if a statement can come in for impeachment purposes, it may be used for all purposes. However, the exclusionary rule — which has developed to protect fundamental constitutional rights — clearly prohibits the use of suppressed evidence as substantive evidence of the defendant's guilt, and thus the court erred by admitting Frett's October 28, 2008 statement. *State v. Harris*, 199 Wis. 2d 227, 544 N.W.2d 545, 553 (1996) (emphasizing that the "procedure" required by *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) — that is, that an officer cease interrogating a suspect once the suspect requests counsel-exists to protect the constitutional right to counsel under the Fifth Amendment).

██ ██ The use of suppressed statements as substantive evidence of a defendant's guilt typically constitutes reversible error. *See, e.g., United States v. Brownlee*, 454 F.3d 131, 148 (3d Cir. 2006) (reversing a conviction where evidence that should have been suppressed was instead used against the defendant as substantive evidence). However, the Court is required by Supreme Court Rule 4(i) to consider whether, in the context of this particular case, the error is merely harmless. " 'An evidentiary error is harmless if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.' " *Browne v. People*, 56 V.I. 207, 226 (V.I. 2012) (quoting *Ferguson v. United States*, 484 F.3d 1068, 1074-75 (8th Cir. 2007)). "While constitutional errors [involving the admission of evidence that ought to have been suppressed] do not always require reversal, in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967), the Supreme Court ruled that 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' The burden is on the beneficiary of the error, in this case the People, to make this showing. *Id.*" *Simmonds v. People*, 53 V.I. 549, 561 n.7 (V.I. 2010); *see also Arizona v. Fulminante*, 499 U.S. 279, 295, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) ("harmless error" review applies to the improper admission of an involuntary confession).

Here, the People did not show that the error was harmless. Indeed, they did not recognize any error. Instead, they address their entire brief to the

question of whether the admission of a prior inconsistent statement for substantive evidence is a .proper exception under section 19 of title 14 to the general prohibition on hearsay evidence. (Appellee's Br. 6-11.) In their brief and during oral argument they failed to address the critical question of whether the use of suppressed testimony — obtained in violation of the defendant's constitutional right to counsel — was merely harmless error. For this failure alone, the Court could decline to find the error harmless.

■ Even if the People had tried to carry their burden of showing harmless error — which they did not — they could not have succeeded under the circumstances of this case. Without Frett's written statement, the evidence conflicts: Southwell testified that he and Frett were in the car with Lerner, and that Frett shot and killed Lerner; Frett, on the other hand, testified at trial that he was never in the car with Lerner and did not know what happened to him. Without Frett's prior statement, the jury would have weighed the conflicting testimony and may have discounted Southwell's version of the events because, having reached a plea agreement with the People, he had an incentive to blame Frett for Lerner's murder.

Once the suppressed statement was used as substantive evidence, however, the jury had before them an admission by Frett that he was in the vehicle with Lerner before Lerner died. (J.A. 556, 563, 622.) Frett's admission to being in the car with Lerner and Southwell is consistent with Southwell's testimony and significantly bolsters the People's theory of the case. If the jury chose to believe Frett's statement — rather than Frett's trial testimony — the statement would have had serious inculpatory value. *See Fulminante*, 499 U.S. at 296 (in its analysis of the harmless error rule, noting that one reason confessions are powerful evidence — "probably the most probative and damaging evidence" — is because they "come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct," and therefore they have a "profound impact on the jury" (quoting *Bruton v. United States*, 391 U.S. 123, 140, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) (White, J., dissenting)). The People heightened the probative force of the suppressed statement when they repeatedly referred to it during closing argument and emphasized the fact that it was consistent with Southwell's testimony. (J.A. 721-22; J.A. 744-45.)

This case is not one where prejudicial evidence that should have been excluded entirely was wrongly admitted into evidence. Instead, it is one in which evidence properly admitted for a limited purpose — in this case, impeachment — was allowed to be used beyond its limited purpose. It could therefore be argued that since the People could properly have used the statement for impeachment purposes, the jury would have heard Frett's admission that he was in the vehicle with Lerner anyway, and thus its improper use as substantive evidence was likely harmless. However, had the statement been properly used solely for impeachment, the court would have provided a limiting instruction, informing the jury that they could not use the statement as evidence that Frett was actually in the car with Lerner, or to establish the truth of any other fact therein. FED. R. EVID. 105. Of course, such an instruction cannot eliminate entirely the danger that the jurors might have misused the statement as substantive evidence. *See People v. Tate*, 30 Ill. 2d 400, 197 N.E.2d 26, 28 (Ill. 1964) (noting that the use of prior inconsistent statements for impeachment only "has never been entirely satisfactory because of the difficult mental operation it imposes upon the jurors, [requiring them to] 'consider it for one purpose but avoid being influenced by it for another purpose' " (quoting Comment-Note, *Extrajudicial Statements by Witness Who is Subject to Cross-Examination as Evidence of Facts to Which They Relate*, 133 A.L.R. 1454, 1466 (1941))).

█ █ Nonetheless, the possibility that the jurors themselves might commit error by failing to abide by the trial court's limiting instructions does nothing to reduce the harm caused by the People's purposeful error in misusing the evidence and the trial court's sanctioning of it. First, we presume that jurors follow the court's instructions and thus would not have relied on the statement as evidence of Frett's guilt, if they had been so instructed. *Augustine v. People*, 55 V.I. 678, 686 (V.I. 2011). Second, the introduction of any evidence in violation of the Rules of Evidence reduces the fairness of the trial, *People v. Lucas*, 58 Ill. App. 3d 541, 374 N.E.2d 884, 889, 16 Ill. Dec. 109 (1978) (noting that defendants are "entitled to have [their guilt] decided by a trier of fact [who] was not prejudiced by incompetent evidence"), and this is particularly so where, as here, the evidence is initially excluded because it was procured in violation of a defendant's constitutional rights. Indeed, it is the very danger that jurors might improperly rely on such evidence as proof of guilt that courts often find harmful error. *State v. Johnson*, 774 So.2d 79,

81 (La. 2000) (declining to find the error harmless); *Ellis v. State*, 622 So.2d 991, 998 (Fla. 1993) ("Whenever improper evidence becomes so prominent a feature of the trial, a court cannot find that the error was harmless beyond a reasonable doubt."). Even when the standard of review is the more exacting "plain error" standard, appellate courts often find that the error requires reversal. *See, e.g., United States v. Hogan*, 763 F.2d 697, 703 (reversing for plain error because "[t]he danger that the uninstructed jury relied on the impeaching statement as substantive proof is great"), *mod. on other grounds on reh'g*, 771 F.2d 82 (5th Cir. 1985); *State v. Collins*, 186 W. Va. 1, 409 S.E.2d 181, 191 (1990) (failure to instruct jury that prior inconsistent statement could be used only for impeachment constituted plain, and therefore reversible, error); *Towles v. United States*, 428 A.2d 836, 843 (D.C. 1981) (finding plain error, and reversing, because of the jury's "likely improper consideration of the impeaching statement as substantive evidence"). We therefore conclude that the possibility that an appropriately instructed jury might nonetheless have used Frett's prior statement improperly during deliberations does not lessen the prejudicial effect of the People's repeated use of the statement as substantive evidence. Reviewing this issue on appeal, the Court cannot say that the admission of the suppressed statement as substantive evidence was harmless beyond a reasonable doubt.[14] For this reason, we will reverse Frett's convictions and remand for a new trial.

## C. Recusal of the Trial Judge

Frett also argues that the trial judge erred when he failed to recuse himself from the trial of this case. It does not appear that Frett ever raised this issue below.[15] Consequently, we review this challenge for plain error. *See United States v. Vampire Nation*, 451 F.3d 189, 208 (3d Cir. 2006)

---

[14] It should be emphasized that the Court's ruling addresses only whether the People met their burden of demonstrating that the error was harmless beyond a reasonable doubt. Frett did not argue on appeal that the evidence was insufficient to support his convictions and therefore the Court does not reach that question.

[15] It does not appear Frett ever filed any written motions with the trial court, nor is there any evidence he orally moved for such relief. Instead, it was the People who filed a motion for recusal on May 19, 2010, which, during oral argument, counsel for the People said had nothing to do with the earlier withdrawal of the Office of Public Defender as Frett's counsel. Indeed, there is no indication in the record of whether Frett opposed the People's motion. In violation of Supreme Court Rule 24(a), Frett did not include the People's recusal motion. As

(stating that the court's decision not to recuse *sua sponte* is reviewed for plain error). The relevant local statute — which Frett failed to cite in his brief — states in relevant part:

No judge or justice shall sit or act as such in any action or proceeding:

. . . .

(3) When in the action or proceeding or in any prior action or proceeding involving the same issues, he has been of counsel for any party to the action or proceeding; or

(4) When it is made to appear probable that, by reason of bias or prejudice of such judge, a fair and impartial trial cannot be had before him.

4 V.I.C. § 284.

As the factual basis for his challenge, Frett notes that the Territorial Public Defender representing Frett at his initial court appearance — Samuel Joseph, Esq.[16] — moved *to withdraw as counsel on the basis of* an alleged conflict of interest. Frett argues that any conflict affecting the Office of Public Defender should be imputed to the Chief of the Public Defender's Office. The Chief at the time of the withdrawal motion, Harold Willocks, Esq., later became the judge presiding over Frett's criminal trial. Consequently, Frett argues, Judge Willocks had an existing conflict of interest and should have recused himself *sua sponte*.

However, Frett failed to provide this Court with any evidence whatsoever regarding Judge Willocks's alleged conflict of interest. His brief merely relates that, "Since Lerner was a fellow attorney, *it appears as if* the Office of the Public Defender was unable to provide conflict[-] free representation." (Appellant's Br. 11 (emphasis added).) But Frett did not provide the transcript of the October 29, 2008 hearing at which Attorney Samuel Joseph orally moved to withdraw. And the docket entry for that date merely states that "Attorney Samuel Joseph on behalf of the Territorial Public Defenders Office made an oral motion for said matter to be assigned to a private attorney." (J.A. 16.) Consequently, the Court is

a motion with independent relevance to the recusal issue, it should have been included in the Joint Appendix. V.I.S.Ct.R. 24(a).

[16] To avoid confusion, the Opinion refers to Frett's counsel by their full names, as Frett's initial attorney was Samuel Joseph, Esq., of the Public Defender's Office, and the attorney later assigned to him was Michael Joseph, Esq., a private attorney.

unable to independently discern on what basis he moved to withdraw himself and his Office as counsel, or whether there was, in fact, any actual conflict of interest which required such a withdrawal.

Even if there were no conflict of interest substantiating the October 29, 2008 motion to withdraw, we must still determine whether the judge should have recused himself on the basis that Attorney Samuel Joseph's representation of Frett during the interim period before the withdrawal motion was granted caused the Public Defender's Office to obtain any confidential information prejudicial to Frett which might be imputed to the then-Chief of that Office, Judge Willocks. *See People v. Julien*, 47 P.3d 1194, 1197-98 (Colo. 2002) (*en banc*) (interpreting Colorado's ethical rules regarding judges, which closely mirror the ABA's Model Rules, and determining that a judge need not recuse himself simply because he was employed by the district attorney's office at some point during the case, but instead only if the judge has "performed some role in the case or . . . obtained actual knowledge of disputed evidentiary facts of the case"); *see also Payne v. State*, 265 So.2d 185, 191 (Ala. Crim. App. 1972) ("The holding of prosecutorial office as distinguished from working on a concrete piece of litigation is not alone disqualifying for one who later becomes a judge."); *cf. In re Bulger*, 710 F.3d 42, 44, 47 (1st Cir. 2013) (deciding that the trial judge should be recused not simply because he held leadership roles in the U.S. Attorney's Office, but because he had served in those roles during a time in which the defendant had significant contacts with that office, allegedly receiving immunity in exchange for information, and during a time in which publicly available information "disclosed disquieting links between the Government and the criminal element during the years in question, [which] may fairly simulate a critical attitude on the part of an independent observer").

However, Frett failed to provide a sufficient record for this Court to evaluate his conflict of interest claim. It appears that the Public Defender moved to withdraw at the first appearance on October 29, 2008, which took place the morning after the evening on which Frett was arrested. The court's February 24, 2011 Memorandum Opinion suppressing Frett's statement to the police demonstrates that Frett did not receive the counsel he requested when he was first arrested on October 28, 2008. Consequently, it is entirely likely that Attorney Samuel Joseph obtained no information about Frett before the court appearance and before the Motion to Withdraw was granted. Although the docket entries suggest that

511

Attorney Samuel Joseph subsequently appeared with Frett at the next hearing on November 6, 2008 — even after the motion to withdraw was granted — it is not clear whether Samuel Joseph actually appeared, considering the fact that the court had already granted the withdrawal of the Public Defender's Office. Furthermore, there is no evidence he ever consulted with Frett.

Even if an unknown representative of the Public Defender's Office did appear with Frett on November 6, 2008, and so represented Frett during the period between his October 29, 2008 appearance and the November 6, 2008 appearance, there is no evidence in the record to suggest that this attorney obtained *any* confidential information about Frett or the case during this time. If the Public Defender did not obtain any confidential or prejudicial information, there is none to impute to the Chief of that Office, and consequently the recusal challenge is meritless. Since the burden on plain error review lies with Frett — who, notably, is in the best position to know whether he shared any confidential or prejudicial information with Attorney Samuel Joseph — and since Frett has failed to substantiate the claim, the Court does not find plain error in Judge Willocks's failure to recuse himself from the case *sua sponte*.[17] *See State v. Gomes*, 93 Haw. 13, 995 P.2d 314, 318-19 (2000) (emphasizing that the standard for a challenge to a judge's failure to recuse himself or herself *sua sponte* is "plain error" and that the appellant bears the burden of establishing such error).

## D. Jury Instructions

Frett also contends that the trial court impermissibly denied his request to provide a special cautionary instruction regarding accomplice liability. Although, as discussed above, we will reverse Frett's convictions and require a new trial on constitutional grounds, we nonetheless choose to reach the instruction issue so as to provide guidance to the trial court during the retrial.[18] *See Fontaine v. People*, 56 V.I. 571, 593 (V.I. 2012)

---

[17] Although there is not sufficient evidence in this record to establish "plain error," Frett is free to raise the recusal issue below once the case is remanded for a new trial.

[18] As an initial matter, Frett failed entirely to follow this Court's rules with regard to this claim. Although Rule 22(a)(5) requires the Appellant's Brief to contain "citations to the . . . parts of the record relied on," Frett's attorney does not include anywhere in her brief a reference to the point in the record at which Frett requested a specific jury instruction, or where

(stating that the Supreme Court may address an issue that is likely to recur on remand in order to provide guidance to the Superior Court); *Smith v. Turnbull*, 54 V.I. 369, 374 (V.I. 2010) (same).

While the trial court did give an accomplice liability instruction,[19] it did not follow precisely the Third Circuit Model Instruction requested by Frett.[20] (J.A. 795-96; 822.) Specifically, the court declined to advise the jury that they should consider Southwell's testimony "with great care and caution" because his plea arrangement with the People might incent him to lie. In his post-trial motions, Frett raised this as grounds for a new trial, but the court denied the request. The court stated that "Defendant's request would contradict the other instructions that direct the jury to be the sole determining factor as to how much weight to place [on] the credibility of the witnesses' testimony." (J.A. 36.)

---

the court refused to give it. However, because the Court fears that an error may have been made, it will review the issue.

[19] The trial court's instruction to the jury stated in relevant part:

> You have heard the evidence of John Southwell, an alleged accomplice, who says he participated in the crime charged and received a benefit from the government in exchange for testifying. His testimony was received in evidence and may be considered by you. The government is permitted to present the testimony of someone who has reached a plea bargain with the government and received a benefit from the government in exchange for his testimony. In evaluating John Southwell's testimony, you should consider this factor along with others I have called to your attention. Whether or not his testimony may have been influenced by the plea agreement is for you to determine. You may give John Southwell's testimony such weight as you think it deserves.

(J.A. 822.)

[20] Frett requested that the trial court include in its instruction the "great care and caution" language from the Third Circuit's model instructions, so that the court's instruction would read,

> You have heard the evidence of John Southwell, an alleged accomplice, who says he participated in the crime charged and received a benefit from the government in exchange for testifying. His testimony was received in evidence and may be considered by you. The government is permitted to present the testimony of someone who has reached a plea bargain with the government and received a benefit from the government in exchange for his testimony, *but you should consider Southwell's testimony with great care and caution.* In evaluating John Southwell's testimony, you should consider this factor along with others I have called your attention to, whether or not his testimony may have been influenced by the plea agreement is for you to determine. You may give John Southwell's testimony such weight as you think it deserves.

J.A. 795-96; Third Circuit Court of Appeals Criminal Jury Instructions 4.19 (emphasis added).

 The leading case from the Third Circuit Court of Appeals on the question of whether the "great care and caution" instruction is necessary is *United States v. Isaac*, 134 F.3d 199, 39 V.I. 470 (3d Cir. 1998), to which the trial court cited. In *Isaac*, the Third Circuit Court of Appeals declined to address the question of whether it is error *per se* for the court to refuse to give such an instruction when it is requested. *Id.* at 204. However, the Court of Appeals emphasized that it is the better practice to give the instruction whenever the witnesses "have strong incentives to fabricate or mold their testimony as the government desires in order to escape prosecution, lighten their sentences, obtain remuneration or receive protection." *Id.*

While reiterating that the trial courts should give the instruction in most cases involving such witnesses, the Third Circuit declined to reverse Isaac's conviction because it noted that certain circumstances reduced the need for the instruction. First, the defendant had broad latitude during the trial to challenge the witness's credibility, and second, the court's other instructions properly informed the jury that they could consider whether self-serving motives of the witness diminished his credibility. *Id.* at 205.

 We adopt and apply the Third Circuit's test for evaluating the failure to provide the "great care and caution" instruction pertaining to accomplices. In this case, the defense had adequate opportunity to probe Southwell's credibility. The court did not restrict Frett's cross-examination of him, and Frett was free to emphasize Southwell's plea agreement with the People. Indeed, the People encouraged Southwell to discuss the plea agreement on direct examination. (J.A. 377-78.) After Southwell's testimony, Frett indicated that he might recall the witness in order to ask further questions about a possible offer of early parole and the government's offers of relocation. (J.A. 420.) The court permitted the recall, but Frett never exercised his right to recall Southwell to pursue those questions. (J.A. 419-20.) During Frett's own testimony, he emphasized that Southwell was lying about Frett's involvement. (J.A. 554.) Finally, during his closing argument to the jury, Frett's counsel stated, "Poor Mr. Southwell; he lied because he is facing life without the possibility of parole for killing Gabriel, and he is lying. He is lying to you. And the lies have been told . . . ." (J.A. 727.) From this record, it is clear that Frett had ample opportunity — unrestricted by the court — to call into question Southwell's motives and his credibility. Furthermore, the court gave several cautionary instructions, including one provided

immediately after Southwell testified about his plea agreement. (J.A. 378.) The court noted that it was for the jury to determine whether Southwell's testimony was influenced by his plea agreement.

 Under the standard established in *Isaac*, the court's failure to give the "great care and caution" instruction would not likely result in reversal. However, we agree with the Third Circuit that it is the better practice to give such an instruction when requested, and we emphasize that as a matter of routine, unless there is a compelling reason to omit it, the trial courts should give this instruction when informing the jury how to weigh the credibility of accomplices, immunized witnesses and witnesses cooperating with the government in return for some benefit. It is clear that the trial courts generally retain discretion in formulating the instructions, but in this case, there was no compelling reason to leave the "great care and caution" language out. The trial court's fear that such language improperly invades the province of the jury is unjustified as the instruction does not require them to discount the witness's credibility, only to weigh it carefully. Upon retrial, the court should reconsider its decision not to give the "great care and caution" instruction if such instruction is requested.[21]

## III. CONCLUSION

The Superior Court committed reversible error when it permitted the People to use a statement obtained in violation of Frett's constitutional right to counsel, and which was suppressed before trial, to be used as substantive evidence against him at trial. On remand, the trial court should provide the "great care and caution" instruction, if requested, when discussing the testimony of any witnesses who benefit from a plea agreement or who could be considered Frett's "accomplices." Finally, the Court does not have before it a sufficiently developed record to determine whether the trial judge should have recused himself and consequently cannot find that the trial judge's failure to recuse himself *sua sponte* constituted "plain error." For these reasons, we reverse Frett's convictions and remand for a new trial.

---

[21] Of course, if some compelling reason arises unrelated to the rationale provided by the trial court below to forego the instruction, the trial court could exercise its discretion to omit the instruction, but if such a situation arises the trial court should make a record of its reasoning so that this Court could review it on any renewed appeal.