**GIBSON CHARLES, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2013-0071

Supreme Court of the Virgin Islands

June 20, 2014

MARTIAL A. WEBSTER, SR., ESQ., St. Croix, USVI, *Attorney for Appellant.*

TIFFANY V. MONROSE, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; SWAN, *Associate Justice*; and MOORE, *Designated Justice.*[1]

## OPINION OF THE COURT

(June 20, 2014)

HODGE, *Chief Justice.* Appellant Gibson Charles appeals the Superior Court's September 17, 2013 Judgment and Commitment, which adjud-

---

[1] Associate Justice Maria M. Cabret is recused from this matter. The Honorable Thomas K. Moore, a retired judge of the District Court of the Virgin Islands, has been designated to sit in her place pursuant to title 4, section 24(a) of the Virgin Islands Code.

icated him guilty of several crimes including aggravated rape in the first degree, aggravated rape in the second degree, unlawful sexual contact in the first degree, and child abuse in the first degree. For the reasons that follow, we affirm the Superior Court's Judgment and Commitment as to all of Charles's convictions. But we also remand for clarification on issues involving the sentence imposed in this case, including resentencing in conformity with 14 V.I.C. § 104.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

Charles resided with his girlfriend, Rosa Mendez, and six children in Paradise Mills apartments located in Fredriksted, St. Croix, starting in 1997 until May 2005. In April 2005, Vincent Liger, employed with the Office of Intake and Emergency Services of the Department of Human Services, received a referral that Mendez's boyfriend was sexually and physically abusing several minor children in the home. Liger conducted an investigation regarding two minor girls residing with Charles and Mendez: X.P., the daughter of Mendez, and A.C., the daughter of Charles. As a result of his investigation, Liger suspected that both girls were being sexually abused and recommended that X.P. and A.C. be removed from the home and be examined by a physician. The physician examinations revealed evidence of sexual activity in both X.P. and A.C. Liger reported the matter to the police who conducted their own investigation, and concluded that both minor girls had been regularly sexually and physically abused by Charles over a six-year period. Charles was subsequently arrested and charged with twelve crimes.[2]

Trial began on July 10, 2007. The People's first witness was Miriam Harris, a neighbor of Charles and Mendez in Paradise Mills who testified that she had seen X.P. sit inappropriately on Charles's lap outside, in their shared back yard. Harris further testified that when X.P. got off his lap, Charles was clearly aroused with his pants unzipped, exposing his erect

---

[2] In total, Charles was charged with four counts of Aggravated Rape in the Second Degree in violation of 14 V.I.C. § 1700a(a) (counts two, three, nine, and ten); three counts of Child Abuse in violation of 14 V.I.C. § 505 (counts five, six, and twelve); two counts of Aggravated Rape in the First Degree in violation of 14 V.I.C. § 1700(a)(1) (counts one and eight); two counts of Unlawful Sexual Contact in the First Degree in violation of 14 V.I.C. § 1708 (counts four and eleven); and one count of Assault in the Third Degree in violation of 14 V.I.C. § 297(2) (count seven).

penis. She also testified to hearing sounds of child abuse emanating from Charles's apartment and subsequently seeing X.P. with a black eye. Next, the People called another neighbor of Charles and Mendez, Donna Webb, who also testified to seeing X.P. sit on Charles's lap inappropriately. She described witnessing, outside their apartment, Charles touch X.P.'s breasts and buttocks "as [her] boyfriend would touch [her]." (J.A. 222.)

The People then called X.P.'s brother, who also lived with Charles and X.P. in Paradise Mills. He testified that Charles frequently called X.P. into a bedroom and locked the door. Upon leaving the bedroom, both X.P. and Charles were always sweaty. Charles would explain that X.P. was cleaning the bedroom, however X.P.'s brother found this suspicious because the bedroom was never clean after these instances. X.P.'s brother also testified to seeing Charles "feel [X.P.] up" and kiss her neck while X.P. sat on his lap. (J.A. 238.)

X.P. also testified. In her testimony, X.P. confirmed that she had lived with Charles in the Paradise Mills apartment since she was three years old and that Charles was her mother's boyfriend. X.P. testified that she was molested by Charles starting at the age of five. She described that she was first raped by Charles in 1999, when she was nine years old, the same year she first began menstruating. X.P. explained that Charles called her into his room, locked the door, and told her that since she had her period "[her] hole ha[d] to be opened." (J.A. 262.) Charles then pinned her down to the bed, forcibly undressed her, forced her legs open, put pillows over her face to deafen her screams, and raped her. X.P. maintained that Charles continued to rape her every day until she was fifteen. The sexual activity would normally occur in Charles's bedroom when Mendez was at work.

X.P. also testified that Charles touched her private areas outside where neighbors could see. In addition, X.P. testified that Charles beat her on numerous occasions with a gun and various other household objects. On one such occasion, after Charles had heard she had a boyfriend at school, he beat X.P. so severely that her face became swollen to such an extent that she could not smile for a month. Additionally, X.P. testified to becoming pregnant as a result of being raped by Charles. X.P. stated that Charles was the one who impregnated her, since she had not engaged in sexual intercourse with anyone else during that time. She further stated at trial that after she told Charles she was pregnant he forced her to drink different concoctions he created, in an effort to terminate the pregnancy, which caused her to vomit. When these efforts did not work, Charles

took X.P. to a physician to get an abortion. As this required the approval of X.P.'s mother, Charles told Mendez that a boy at X.P.'s school was responsible for the pregnancy. It was later established through testimony from Mendez and the doctor who performed her abortion, that the abortion occurred in February 2004, when X.P. was thirteen. Lastly, X.P. testified that the final time Charles raped her was May 1, 2007, because she was removed from the home by Human Services two days later on May 3, 2007. X.P. admitted to not telling anyone about Charles's actions for such a long period of time because he threatened to kill her mother and siblings if she spoke about it.

A.C., who at the time of trial was sixteen years old, also testified. A.C. stated that she first began living with Charles and Mendez when she was nine years old. A.C. testified that Charles raped her for the first time when she was nine and continued to rape her until she was fourteen. While describing the first time she was raped, A.C. testified that "sperm-like, sticky, white stuff" came out of Charles's penis and that he told her to take a shower afterwards. (J.A. 494.) She maintained that Charles frequently put his penis in her mouth and anus. A.C. also testified that Charles touched her private parts "like he would touch his wife." (J.A. 503.) A.C. further asserted that she was beaten, along with all the children, by Charles. When asked, A.C. testified that she did not tell anyone about these occurrences because Charles threatened to kill her and others if she told anyone.

Dr. Norman Torres and Dr. Michelle Berkley also testified at the trial. Dr. Torres, a gynecologist, examined A.C. from a referral by the Department of Human Services in June 2005. As a result of his examination, Dr. Torres concluded that A.C. had been sexually abused. Dr. Berkley, also a gynecologist, examined X.P. in May 2005 as a result of a referral from the Department of Health. Based on X.P.'s physical exam, Dr. Berkley concluded that X.P. was not a virgin. X.P. originally explained to Dr. Berkley that she had taken a beer bottle and put it in her vagina. Dr. Berkley, not believing this explanation, further questioned X.P. and X.P. eventually admitted that she was raped by Charles.

The trial lasted six days, and at its conclusion the jury found Charles guilty on all counts except for assault in the third degree. Charles filed a Motion for Judgment of Acquittal and a Motion for a New Trial that were both denied in an Opinion dated July 10, 2013. In its September 17, 2013

Judgment and Commitment, the Superior Court sentenced Charles to twenty years incarceration for the first-degree aggravated rape of X.P., twenty years incarceration for the first count of second-degree aggravated rape of X.P., twenty years incarceration for the second count of second-degree aggravated rape of X.P., and twenty years incarceration for the first-degree aggravated rape of A.C. Both first-degree aggravated rape convictions were to run consecutively and most of the other counts were to run concurrent with the first-degree aggravated rape convictions. But the Superior Court did not specify whether the two counts for second-degree aggravated rape of X.P. should run concurrent or consecutive with any other counts. Charles filed a timely notice of appeal on September 4, 2013.[3]

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4, § 32(a). Because the Superior Court's September 17, 2013 Judgment and Commitment constitutes a final judgment, this Court possesses jurisdiction over Charles's appeal. *See, e.g., Codrington v. People*, 57 V.I. 176, 183 (V.I. 2012) (in a criminal case, the written judgment embodying the adjudication of guilt and the sentence imposed based on that adjudication constitutes a final judgment for purposes of 4 V.I.C. § 32(a)).

An appellant who challenges the sufficiency of the evidence bears a "very heavy burden." *Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009) (quoting *United States v. Losada*, 674 F.2d 167, 173 (2d Cir. 1982)). When we consider challenges to the sufficiency of the evidence, "we apply a particularly deferential standard of review. Following a criminal conviction, we view the evidence presented at trial in a light most favorable to the People." *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009) (quoting *Smith v. People*, 51 V.I. 396, 398 (V.I. 2009)). Therefore, "[w]e will affirm a conviction if any rational trier of fact could have found the

---

[3] *See* V.I.S.CT.R. 5(b)(1) ("A notice of appeal filed after the announcement of a decision, sentence, or order — but before entry of the judgment or order — is treated as filed on the date of and after the entry of judgment.").

essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Smith*, 51 V.I. at 398).

Generally, this Court exercises plenary review when a criminal defendant challenges the Superior Court's sentencing decision based solely on the application of legal precepts. *Williams v. People*, 58 V.I. 341, 350 (V.I. 2013) (citing *Cheatham v. People*, S. Ct. Crim. No. 2008-0026, 2009 V.I. Supreme LEXIS 22, *4 (V.I. Mar. 27, 2009) (unpublished)). However, when a criminal defendant fails to object to a Superior Court decision or order — as was the case here — this Court ordinarily only reviews for plain error. *See* V.I.S.CT.R. 4(h); *see also Francis v. People*, 52 V.I. 381, 390 (V.I. 2009). For this Court to reverse a judgment of the Superior Court under the plain error standard of review, "there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' " *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 466-67, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997)). However, even "[i]f all three conditions are met," this Court may reverse the Superior Court "only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 390-91.

## B. Sufficiency of the Evidence

Charles maintains that the evidence supporting his convictions for counts one, two, three, four, six, eight, ten, and eleven is not sufficient to establish that the crimes were committed during the time period alleged in the Information. We address each claim in turn.

### a. *Counts One, Two, and Three*

 For counts one, two,[4] and three, the People charged Charles with the crimes of aggravated rape in the first and second degree involving X.P.

---

[4] Charles also argues that the People failed to provide sufficient evidence to convict under counts one and two. We disagree, as there is ample evidence from X.P.'s testimony that could lead a rational juror to find Charles guilty on both counts. For count one, the People were required to prove that Charles performed an act of sexual intercourse with X.P., that X.P. was not Charles's spouse, and that X.P. was under the age of thirteen. *See* 14 V.I.C. § 1700(a)(1). From the testimony at trial, it was established that X.P. was first raped when she was nine years old and that X.P. was not Charles's spouse. Furthermore, X.P. provided details of how Charles pinned her down to the bed, forcibly undressed her, forced her legs open, and raped her. The testimony from X.P. alone is enough to prove all the elements required for counts one and two. *Francis v. People*, 57 V.I. 201, 211 (V.I. 2012) ("The testimony of one witness is sufficient to prove any fact") (quoting 29A AM.JUR.2D *Evidence* § 1363). For count two, the People were required to prove that Charles preformed a sexual act, that X.P. was under

occurring on or about[5] July 1999, December 2003, and May 2005, respectively. X.P.'s testimony established that she was raped for the first time when she was nine years old, after experiencing her first period. It was conclusively established that X.P. was nine years old in 1999, since she was born on February 23, 1990. X.P. also described in detail the first time she was raped, and the timing of her first period was corroborated by Mendez's testimony. Thus, there was sufficient evidence to conclude that X.P. was raped on or about July 1999, as charged.

Furthermore, testimony established that X.P. was pregnant and had an abortion in February 2004. Given this time frame, it would be reasonable

eighteen years of age but at least thirteen years of age and not his spouse, "or [that] force, intimidation, or the perpetrator's position of authority over the victim [was] used to accomplish the sexual act." *See* 14 V.I.C. § 1700a(a). While neither party addressed the issue in this case, whether the People were required to prove that the sexual act was committed through the use of force, intimidation, or the perpetrator's position of authority when the victim is between the ages of thirteen and eighteen remains an open question. *See Gilbert v. People*, 52 V.I. 350, 360 n.8 (V.I. 2009) (declining "to determine . . . whether the People are required to prove use of force, intimidation, or abuse of a position of authority to sustain a conviction pursuant to section 1700a(a) with respect to a . . . victim [between the ages of thirteen and eighteen]"). In this case, X.P. was between the ages of thirteen and eighteen at the time the rapes charged in count two occurred. But because it is clear that Charles's position of authority over X.P. was used to accomplish the rape, we need not resolve this issue here. Indeed, at all times between 2003 and 2005, Charles — as step-father to X.P. — utilized his "position of authority" over her to accomplish his sexual assaults, including exploiting his authority as the minor's step-parent to remove her from school to perpetrate the sexual acts involved in this case. Accordingly, X.P.'s testimony was sufficient to prove the elements required for count two.

[5] To the extent that Charles argues that the use of "on or about" dates amounted to a prejudicial variance between the Information and the evidence produced at trial, in violation of the Sixth Amendment's notice requirement, we disagree. (Appellant's Br. 17.) While it is true that each count in the Information — other than count twelve, where no date was provided — specified the time period of the alleged crime with "on or about" language, where "on or about" language is used, the People is not required to prove the exact date, so long as a date reasonably near is established. *See, e.g., Real v. Shannon*, 600 F.3d 302, 308 (3d Cir. 2010). This is especially true where the exact time when an offense was committed is not an essential element of the offense charged. *See United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987). Because the People proved that each of the crimes alleged in the Information occurred on a date "reasonably near" the date listed in the Information, Charles's argument that the evidence introduced at trial amounted to a prejudicial variance from the dates provided in the Information is without merit. *See United States v. Barsanti*, 943 F.2d 428, 438-39 (4th Cir. 1991) (variance of four months did not prejudice defendant); *Real*, 600 F.3d at 308 (an offense committed within a month of the month specified in an "on or about" information is "reasonably near"); *cf. United States v. Ross*, 412 F.3d 771, 775 (7th Cir. 2005) (four years is not "reasonably near").

for a trier of fact to conclude that X.P. was raped by Charles on or about December 2003, resulting in her pregnancy. Finally, X.P. testified that she was raped for the last time in May 2005 because she was removed from the home soon thereafter. The uncorroborated testimony of the victim is sufficient to sustain the convictions. *Stevens v. People*, 52 V.I. 294, 308 (V.I. 2009) (citing *Phipps v. Gov't of the V.I.*, 241 F. Supp. 2d 507, 511 (D.V.I. App. Div. 2003)). Thus, based on the record, the jury had sufficient evidence to determine the timing of the charged acts for counts one, two, and three.

### b. *Count Four and Six*

■■ Count four[6] charged Charles with committing unlawful sexual contact with X.P. in September 2004. Webb testified to witnessing Charles touch X.P.'s breasts and buttocks on two separate occasions. Although Webb could not remember the exact date she witnessed these actions, in 2007 she did recall that this happened "maybe three years ago." Harris added to Webb's testimony, testifying that she witnessed X.P. sitting on Charles's lap outside their apartment, and when X.P. got off his lap Charles had his zipper down exposing his erect penis. Additionally, X.P.'s brother testified that he observed Charles "feel [X.P.] up" and kiss her neck while X.P. sat on his lap. Although X.P.'s brother did not specify what "feel up" meant, X.P. used the same terminology in her testimony when she stated that Charles used to "feel up [her] breasts" while she sat on his lap outside their apartment. (J.A. 266.) Therefore, there is adequate evidence presented from which a rational trier of fact could determine that at least one act of unlawful sexual contact occurred in September 2004.

■ Count six charged Charles with the child abuse of X.P. on or about August 2003. X.P., A.C., and X.P.'s brother all testified that Charles

---

[6] Regarding count four, Charles also argues that there is a lack of evidence establishing that his contact with X.P. was "sexual contact," as required by the statute, because it was not for the purpose of arousal or sexual gratification. *See* 14 V.I.C. § 1699 (sexual contact is defined as the intentional touching of a person's intimate parts, whether directly or through clothing, to arouse or to gratify the sexual desires of any person). Harris testified that she witnessed Charles's pants zipper down and that he had an erection after taking X.P. off his lap. (J.A. 203-04.) There was also testimony that Charles touched X.P. on the breasts and buttocks. · (J.A. 222.) Both instances are clear evidence of sexual contact as defined by the statute and therefore sufficient evidence exists to find Charles guilty of unlawful sexual contact in violation of 14 V.I.C. § 1708(3).

physically abused X.P. after hearing that she had a boyfriend at school. On direct examination, X.P. explained that this took place in the summer of 2003, when she was in the seventh grade. At the time of trial, X.P. was seventeen and in the eleventh grade, giving rise to the inference that she was thirteen years old in the summer of 2003. According to X.P., Charles struck her on her forehead with the butt of his gun, punched her in the face, and also beat her with "anything he could find." She testified that as a result of this abuse, her face, lip, nose and eyes were so swollen that she could not smile for a month. X.P.'s brother confirmed the severity of this abuse stating that X.P. was bleeding and had a swollen lip and a black eye. Harris also testified to seeing X.P. with a black eye when X.P. was twelve or thirteen, which would have been in 2002 or 2003. Therefore, we find that there is sufficient evidence to establish that Charles physically abused X.P. on or about August 2003.

### c. *Counts Eight, Ten, and Eleven*

■ Counts eight, ten, and eleven concerned the aggravated rape and unlawful sexual contact by Charles towards A.C. on or about December 1999, May 2005, and January 2005, respectively. Similar to X.P., A.C. testified that she was nine years old when Charles first raped her. A.C. was born on September 22, 1990, and therefore would have been nine years old in December 1999. Furthermore, A.C. testified that the last time she was raped by Charles was on Thursday May 5, 2005. She believed that Charles was arrested the next day; however Charles was actually arrested on May 24, 2005. Although A.C. may have not remembered the exact date, her memory of the month and year is sufficient for a rational juror to find Charles guilty of rape on or about May 2005.

Lastly, A.C. testified on cross-examination that she told Detective Naomi Joseph of the Virgin Islands Police Department that Charles raped her sometime between January 3 and 7, 2005. This testimony is consistent with her direct examination stating that every week, from the time she was ten years old until she was fourteen years old, Charles penetrated her with his penis vaginally, orally, and anally. This evidence was sufficient to support a finding of unlawful sexual conduct in the first degree occurring on or about January 2005.

Therefore, we hold that the evidence for counts one, two, three, four, six, eight, ten, and eleven, was sufficient to establish that the crimes were committed during the time period alleged in the Information.

## C. Due Process

### a. *Sixth Amendment Claim*

Charles argues that counts five and twelve violate his Sixth Amendment[7] right to be informed of the nature of charges against him by failing to describe the specific acts of child abuse being charged, as well as by failing to provide him with notice of the time periods of the alleged child abuses. In particular, Charles argues that counts five and twelve of the Information failed to provide him notice because the counts either listed a six-year charging period (count five) or provided no date at all (count twelve).[8] We disagree.

■ Both counts charge Charles with the "repeat[ed] sexual abuse" of X.P. and A.C. in violation of section 505 of title 14 of the Virgin Islands Code, while Charles resided in the same household as X.P. and A.C. Section 505 imposes criminal penalties upon any person who "[abuse[s]] a child." Section 503(a) of title 14 defines abuse as "the infliction of physical, mental or emotional injury upon a child, or maltreatment, *sexual conduct with a child*, or exploitation of a child by any person." (Emphasis added). In ascertaining the meaning of "sexual conduct," this Court has stated that sexual intercourse would clearly qualify as sexual conduct. *LeBlanc v. People*, 56 V.I. 536, 544 (V.I. 2012). This proposition was re-affirmed in *Brathwaite v. People*, 60 .V.I. 421, 436-437 (V.I. 2014), when this Court specifically held that "sexual conduct" encompasses sexual intercourse or forcible penetration of a child's vaginal cavity.[9]

---

[7] The Sixth Amendment is applicable to the Virgin Islands pursuant to section 3 of the Revised Organic Act. *See* The Revised Organic Act of 1954, § 3, 48 U.S.C. § 1561.

[8] Prior to trial, the Superior Court recognized the double jeopardy issues in not providing a more specific date for counts five and twelve and requested the parties to brief the issue. Ultimately the parties never briefed the issue and the Superior Court made no apparent ruling at trial. The People had an opportunity to amend the Information to specify a narrower time frame for the counts but took the position that X.P. and A.C. were sexually abused every day from July 1999 to May 2005.

[9] Charles also argues that section 505 is unconstitutionally vague because it fails to set out the degree of risk and of injury sufficient to trigger the imposition of criminal penalties or to distinguish criminal from non-criminal conduct. In *LeBlanc*, we held that section 505 was unreasonably vague as applied to the defendant because it was not clear if touching a minor's genital region through her pants was considered "sexual conduct." *LeBlanc*, 56 V.I. at 544-45. However, this Court has made clear that section 505 is not unconstitutionally vague when the "sexual conduct" alleged is sexual intercourse or forcible penetration of a child's

■ The Sixth Amendment of the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. CONST. amend. VI. In assessing the sufficiency of an information, the United States Supreme Court has identified two constitutional requirements. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 108, 127 S. Ct. 782, 166 L. Ed. 2d 591 (2007). First, an indictment or information must "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend." *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974)). Second, an information must "enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.*

■ ■ An information should be read "in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007) (quoting *United States v. King*, 200 F.3d 1207, 1217 (9th Cir. 1999)); *see also United States v. Vidaure*, 861 F.2d 1337, 1341 (5th Cir. 1988) (indictments are read for their clear meaning and convictions will not be reversed because of minor deficiencies which do not prejudice the accused). In addition, sources in the information extrinsic to the specific count can be used to determine whether the defendant was sufficiently apprised of the offense charged. *State v. Spigarolo*, 210 Conn. 359, 556 A.2d 112, 125-26 (1989); *see also United States v. Staggs*, 881 F.2d 1527, 1531-32 (10th Cir. 1989) (in evaluating the sufficiency of an indictment "the entire document may be considered"). In this case, the Information placed Charles on notice that he was being charged with child abuse in violation of section 505 of title 14 of the Virgin Islands Code. Moreover, the Information appropriately stated the elements of child abuse. While the Information failed to specify a particular date or time period in which the acts were committed against A.C. in count twelve, the

---

vaginal cavity. *Brathwaite*, 60 V.I. at 436. In the present case, it was established that Charles engaged in forced vaginal sexual intercourse with X.P. and A.C. Therefore, Charles's actions clearly fall under "[a]buse" as defined by 14 V.I.C. § 503(a) and section 505 is not vague as applied to Charles. *Id.* ("Because [appellant's] conduct clearly fell within the ambit of what is prohibited by § 505, [appellant] does not have standing to challenge the vagueness of the statute as applied to other situations.") (citing *McIntosh v. People*, 57 V.I. 669, 687 (V.I. 2012)).

Information stated that the alleged abuse occurred while Charles "was residing in the same household as" A.C. (J.A. 67.) The evidence at trial was uncontroverted that Charles resided in the same household as A.C. between July 1999 and May 2005. In addition, the details provided in the other counts in the Information alleged that Charles raped X.P. and A.C. while residing in the same household as them, on or about July 1999, December 1999, January 2005, and in May 2005. Accordingly, Charles was fairly informed of the charges against him because counts five and twelve contained the elements of child abuse and — when read in context — provided sufficient notice to Charles of the time period in which the acts were committed.

### b. *Judicial Bias*

Charles also alleges that he was denied a "fair and impartial trial" because the trial court judge acted with bias by giving the impression to the jury — by his actions and demeanor — that Charles was guilty. Specifically, Charles alleges that the trial court judge displayed bias towards Charles by acting as a "third prosecutor" by limiting cross-examination on relevant points, by sustaining key objections during defense's cross-examination of A.C., and by unfairly admonishing defense counsel in the presence of the jury.

In making this argument, Charles cites to no authority supporting his proposition that reversal is required when a trial court judge limits cross-examination, sustains objections, or admonishes counsel in the presence of the jury. Nor does Charles explain how the sustained objections were prejudicial. Furthermore, adverse rulings by a trial court are generally not sufficient grounds to establish bias. *See Walters v. Parrott*, 58 V.I. 391, 409 (V.I. 2013) ("[The appellant] never articulated how the trial court was biased or prejudiced . . . . Rather, he merely disagrees with the trial court's decisions.") (citing 4 V.I.C. § 284); *see also Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994); *Haynes v. State*, 937 S.W.2d 199, 204 (Mo. 1996) (holding that a judge's remarks during trial, even those that are critical or hostile to a party, do not support claim of bias and partiality under due process clause; rather, comments must be considered in context of all statements of judge and of surrounding circumstances when statements were made); *In re M.K.K.*, 286 Mich. App. 546, 781 N.W.2d 132, 144 (2009) ("Disqualification on the basis of bias or prejudice cannot be established merely by repeated rulings against a litigant, even if the rulings are erroneous.").

838

■ In this case, we fail to see how the trial judge's decision to limit the cross-examination on details of how A.C. came to live with Charles — an issue wholly unrelated to whether Charles sexually abused A.C. — was prejudicial. We also do not agree that the trial court unduly "admonished" defense counsel. From the context and circumstances of the case, the record demonstrates that the judge imposed reasonable restrictions on the cross-examination, especially given that A.C. was a minor who appeared to be confused by the line of questioning giving rise to the restriction.[10] Moreover, the judge did permit defense counsel to finish his line of questioning. Therefore, it cannot be said that the trial court's actions rose to the level of actual bias or prejudice that would warrant reversal. *See State v. Dean*, 127 Ohio St. 3d 140, 2010 Ohio 5070, 937 N.E.2d 97, 105 (2010) (holding that critical, disapproving, or even hostile statements by a trial court judge ordinarily do not support a bias or partiality challenge)

---

[10] The entire exchange between Charles's counsel, A.C., and the trial court, where Charles maintains that he was unfairly admonished in front of the jury, was as follows:

ATTORNEY [for Charles]: Your first statement [to the police] said your father had sex with you on January — between January third and January 7 and you said that was a lie; right?

THE WITNESS [A.C.]: Yeah.

ATTORNEY [for Charles]: But you know that statement will cause him to go to jail. You know that?

THE WITNESS [A.C.]: No matter how you put it, he still need to be put in jail because he did it when I was nine growing up.

ATTORNEY [for Charles]: And that is what the prosecutor told you to say?

THE WITNESS [A.C.]: I am saying, I am telling you face-to-face right now.

ATTORNEY [for Charles]: But you didn't tell Ms. Joseph that?

THE WITNESS [A.C.]: I am telling you now.

ATTORNEY [for Charles]: Did you tell Ms. Joseph that before you come to testify today?

THE WITNESS [A.C.]: Tell she what?

ATTORNEY [for Charles]: What you are saying?

THE WITNESS [A.C.]: What I am telling you now? I was trying to tell she that, but I don't know how to say it. I am saying it now.

ATTORNEY [for Charles]: You didn't know how to tell her?

ATTORNEY [for the People]: Objection; asked and answered.

THE COURT: This is your last go around.

ATTORNEY [for Charles]: Am I limited to my cross-examination?

THE COURT: But if you are going to ask the same questions five, six, seven, eight, nine times, move on to new territory.

(J.A. 554-55.)

(quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994)).

## D. Admissibility of Doctors' Testimony

Lastly, Charles makes two arguments regarding the admissibility of testimony from Dr. Torres and Dr. Berkley. Because Charles's trial took place in July 2007, the former Uniform Rules of Evidence ("URE"), previously codified in 5 V.I.C. §§ 771-956, and not the Federal Rules of Evidence now applicable to trials in the Superior Court, governed the proceeding. *Blyden v. People*, 53 V.I. 637, 658 n.15 (V.I. 2010) ("[B]ecause [the defendant's] trial concluded before the URE [were] repealed, this Court applies on appeal the evidentiary rules that were in effect at the time [the defendant] was tried in the Superior Court.").

First, Charles argues that the Superior Court permitted the doctors to give their expert opinion on the ultimate issue when neither was qualified as an expert witness. Specifically, when Charles objected that the prosecution had not sought to qualify Dr. Torres as an expert, the Superior Court expressly held that such qualification was not necessary since Dr. Torres was not testifying as an expert, but had limited his testimony to the facts attained from his direct examination of A.C.[11]

We agree with the Superior Court that these witnesses did not testify as experts. Pursuant to former section 911 of title 5, a lay witness may render opinion testimony that is "rationally based on the perception of the witness" and is "helpful to a clear understanding of [the witness's] testimony or to the determination of the fact at issue." 5 V.I.C. § 911(1). While section 911(1) "does not have a third requirement that lay testimony may not be based on scientific, technical, or other specialized knowledge," this Court has previously held that this requirement is "indirectly incorporate[d]" through section 911(2), which provides that an expert witness may render opinion testimony that is "within the scope of the special knowledge, skill, experience or training possessed by the witness." *Mulley v. People*, 51 V.I. 404, 417-18 (V.I. 2009) (quoting 5 V.I.C. § 911(2)). Thus, section 911 and Federal Rule of Evidence 701

---

[11] Because the Superior Court declined to treat Dr. Torres, and presumably Dr. Berkley, as expert witnesses, we cannot apply the presumption, codified in former 5 V.I.C. § 911(3), that a judge is deemed to have qualified a witness as an expert by permitting the testimony. *Mulley v. People*, 51 V.I. 404, 419-20 (V.I. 2009).

840

codify the same standard as to whether a witness must be qualified as an expert before rendering opinion testimony. *Id.* at 418. Under this standard, a witness with specialized knowledge is nevertheless a lay witness so long as the witness's testimony is limited to actual perceptions. *Compare Allen v. Parkland School District*, 230 Fed. Appx. 189, 194-95 (3d Cir. 2007) (stating that a physician is a fact witness to the extent he or she testifies concerning the facts learned during the treatment of the patient), *Turner v. Delta Air Lines, Inc.*, No. 06 CV 1010, 2008 U.S. Dist. LEXIS 5528, *4 (E.D.N.Y. Jan. 25, 2008) (unpublished) ("[I]f the witness testifies only to the opinions formed in providing plaintiff medical care, such opinions are considered an explanation of treatment notes and the physician may properly be characterized as a fact witness."), *Baker v. Taco Bell Corp.*, 163 F.R.D. 348, 349-50 (D. Colo. 1995) (two doctors that examined accident victim were ordinary fact witnesses), *and Sipes v. United States*, 111 F.R.D. 59, 61 (S.D. Cal. 1986) ("The mere fact that a treating physician may possess opinions regarding the care and treatment provided to the plaintiff herein does not ipso facto render such a physician as an expert witness."), *with Patel v. Gayes*, 984 F.2d 214, 217-18 (7th Cir. 1993) (holding physician who treated plaintiff became expert witness when testimony shifted from their treatment of plaintiff to discussion of the applicable standard of care).

 Although Dr. Torres and Dr. Berkley are medical professionals, their testimony was based on their own interactions with A.C. and X.P. respectively, prior to the filing of any criminal charges. Both physicians testified that their examinations revealed that both girls' hymens were torn, evidencing vaginal penetration and sexual activity. Also, Dr. Berkley testified that her examination of X.P. indicated that whatever penetrated her vagina, tearing her hymen, did not just penetrate it once but several times. Lastly, each physician testified that based on their findings from their examinations and taking into account their history of performing these types of exams, their conclusion was that both children were sexually abused. In other words, although the physicians' specialized training may have contributed to their ability to evaluate each child's injuries, the Superior Court correctly permitted their testimony without qualifying them as experts, given that they limited their testimony to their personal observations of X.P. and A.C. and limited their opinion testimony only to that which was "rationally based on the[ir] perception[s]." 5 V.I.C. § 911(1); *Davoll v. Webb*, 194 F.3d 1116, 1138

(10th Cir. 1999) (physician is ordinary witness if testifies about observations based on personal knowledge and states "expert" facts in order to explain testimony); *Frederick v. Hanna*, No. 05-514, 2007 U.S. Dist. LEXIS 18626, *19 (W.D. Pa. Mar.16, 2007) (unpublished) ("[T]reating physicians . . . may testify as to facts within their knowledge, as opposed to offering expert testimony.").

▮ Charles also argues that the Superior Court erred when it permitted Dr. Berkley to testify that during her consultation with X.P., X.P. identified Charles as the person who raped her. (J.A. 664.) Specifically, Charles contends that this statement constituted inadmissible hearsay. However, as noted above, the URE, and not the Federal Rules of Evidence, were applicable to Charles's trial. Importantly, the URE codified an exception to the hearsay rule that permitted the admission of certain prior consistent statements:

> Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible except:
>
> (1) *Previous statements of persons present and subject to cross-examination.* A statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness. . . .

5 V.I.C. § 932(1). Thus, under the evidence statute then applicable, since X.P. testified at trial and was subject to cross-examination by Charles, the Superior Court committed no error by permitting this testimony. *Ramirez v. People*, 56 V.I. 409, 424-25 (V.I. 2012).

### E. Sentencing

▮ Although Charles has not challenged his sentence on appeal, we have consistently held that "illegal sentences, by their very nature, fulfill the requirements of the plain error test in that they both affect a criminal defendant's substantial rights and 'seriously affect the fairness, integrity or public reputation of judicial proceedings.' " *Murrell v. People*, 54 V.I. 327, 336 (V.I. 2010) (citing *Dunlop v. People*, S. Ct. Crim. No. 2008-0037, 2009 V.I. Supreme LEXIS 41, *21 (V.I. Sept. 15, 2009) (unpublished)). Consequently, this Court may review the legality of the Superior Court's sentence *sua sponte.*

842

██ ██ Title 14, section 104 of the Virgin Islands Code provides that notwithstanding the fact that an individual can be charged and convicted of violating multiple provisions of the Virgin Islands Code, an individual may only be punished for one of the offenses arising out of a single act. *Williams v. People*, 56 V.I. 821, 832-34 (V.I. 2012). If more than one conviction is based on a single act, the trial court must "stay the execution" of punishment for all but one of the convictions. *Williams*, 58 V.I. at 354. Here, Charles was sentenced for his convictions of the aggravated rapes of X.P. and A.C. But Charles was also sentenced for his convictions of the child abuse of X.P. and A.C., in counts five and twelve, which were based on the same acts constituting the aggravated rapes. Therefore, Charles was punished twice for offenses that arose out of a single act in violation of section 104. The Superior Court's failure to heed section 104, even where the court provided for the sentences to run concurrently, is a plain error that warrants reversal. *Id.* at 354-55; *see also Williams*, 56 V.I. at 832-33. Accordingly, we remand for the Superior Court to enter conviction and announce a sentence for each offense of which Charles was convicted, but then stay imposition of punishment where section 104 is implicated.

██ The Superior Court's September 17, 2013 Judgment and Commitment also contains two other errors that warrant correction or clarification on remand. First, the Judgment and Commitment incorrectly identifies the defendant as "Charles Gibson" throughout the document when his name is, in fact, Gibson Charles. Moreover, the Judgment and Commitment fails to specify whether counts two and three are to run concurrently or consecutively with any of the other counts. Since the Superior Court sentenced Charles to twenty years incarceration for both counts two and three, the issue of whether these sentences are to run concurrently or consecutively with each other or the other sentences could potentially make a forty-year difference in Charles's ultimate sentence. This plain error is one which seriously affects Charles's substantial rights and also the integrity and public reputation of judicial proceedings. Therefore, we remand so that these sentencing issues may be addressed.

### III. CONCLUSION

Accordingly, we affirm the Superior Court's Judgment and Commitment as to Charles's convictions. We nevertheless remand for resentencing to comply with 14 V.I.C. § 104 and to correct the name of

the defendant and to address the concurrent or consecutive nature of the sentences in the Superior Court's September 17, 2013 Judgment and Commitment.