**D'SEAN D. THOMAS, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2012-0115

Supreme Court of the Virgin Islands

August 13, 2015

597

GREGORY ADAM THORP, ESQ., The Law Offices of Karin A. Bentz, P.C., St. Thomas, USVI, *Attorney for Appellant*.

PAUL J. PAQUIN, ESQ., Deputy Solicitor General; PAMELA R. TEPPER, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorneys for Appellee*.[1]

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice*.

## OPINION OF THE COURT

(August 13, 2015)

HODGE, *Chief Justice*. D'Sean Thomas appeals the Superior Court's October 17, 2012 judgment and commitment, which adjudicated him guilty of misprision of a felony. While the People introduced sufficient evidence to sustain Thomas's conviction, much of that evidence was obtained in violation of Thomas's Fourth Amendment rights, and its use at trial was not harmless error. Accordingly, we reverse the Superior Court's judgment and commitment and remand for a new trial.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

On July 5, 2011, Thomas called emergency services reporting that Jamal Blyden, his cousin and roommate, had shot himself in an apparent suicide in their apartment on St. Thomas. Thomas made four such calls, until Officers Nigel John and Adelbert Molyneaux of the Virgin Islands

---

[1] The People failed to file a timely appellate brief. Thus, Thomas filed a motion seeking to resolve this matter on the briefs alone and requested that this Court not permit the People to file an untimely brief. That motion was granted by an order dated October 4, 2013.

Police Department ("VIPD") arrived. Upon arrival, Officer John was greeted by Thomas and Rashidi Hodge, who was the only other individual present in the apartment with Thomas and Blyden that night. Officer John followed Thomas and Hodge into the apartment and Officer Molyneaux remained outside to secure the scene. Inside the apartment, Officer John observed Blyden on a chair with an apparent gunshot wound to his head. Since Blyden was still breathing, Officer John removed the gun from his lap and placed it on the nearby bed. Officer John then searched the apartment to make sure it was secure. A short time later, emergency medical technicians arrived and transported Blyden to the hospital. Thomas then drove with Blyden's mother to the hospital. Blyden eventually died at the hospital from the gunshot wound.

After Thomas left the apartment to go to the hospital, a VIPD forensic unit arrived at the apartment. Detective Shani Smith, a member of this unit, entered the apartment and conducted an extensive search, including seizing items as evidence and taking numerous photographs. After this search, Detective Smith went to the hospital to collect gunshot residue samples from the hands of Blyden, Hodge, and Thomas. Detective Smith then returned the next morning to Thomas's apartment to perform another search. At this time, Detective Smith conducted a forensic crime scene examination, during which she observed blood on the rug and on the right side of the chair where Blyden was found sitting. She also examined the firearm that Officer John had found and removed from Blyden's lap and determined that the spent shell casing was out of position for a recently discharged firearm. At no time was a search warrant ever obtained for the apartment.

The VIPD concluded that Blyden's death was a homicide and arrested Thomas on February 14, 2012. Thomas was charged with involuntary manslaughter, failure to safely store a firearm, possession of an unlicensed firearm, preparing false evidence, and misprision of a felony — involuntary manslaughter.

Thomas filed a motion to suppress alleging that all the evidence procured from his residence was obtained in violation of his Fourth Amendment rights. At the suppression hearing held on June 21, 2012, Detective Dwight Griffith testified that he was the lead detective at the crime scene the night of July 5, 2011. Detective Griffith testified that upon arriving at the scene, he had observed a few VIPD officers securing the crime scene and waiting for Detective Smith to arrive. Detective Griffith

explained that "securing" the scene of the crime included locking the apartment door and placing police tape across the door. Detective Griffith testified that the apartment was fully secured because it was not yet known who lived in the apartment. Detective Griffith further testified that neither Blyden, Thomas, nor Hodge were on the premises when he arrived, and that Officer John briefed him on his observations from his initial search of the apartment. On cross examination, Detective Griffith testified that he entered the apartment because the door was open and he could easily see the crime scene from the door frame. Detective Griffith further testified that Detective Smith eventually obtained keys to the residence and learned that Blyden resided in the apartment through Blyden's mother.

At the conclusion of the suppression hearing, the Superior Court orally denied Thomas's motion to suppress the evidence recovered during the initial search conducted by Officer John and Detective Smith. The Superior Court also stated that it "probably" would deny the motion to suppress evidence relating to the items photographed, observed, or seized when Detective Smith returned to the scene after going to the hospital, but would wait to give a final ruling pending further research.

Trial began on July 25, 2012. At the start of trial, the Superior Court addressed the constitutionality of the searches by the VIPD. The Superior Court concluded that the initial search conducted by Officer John in response to Thomas's calls to emergency services, as well as the initial search of the apartment by Detective Smith conducted after the removal of Blyden by the emergency medical technicians, were lawful. However, the Superior Court also ruled that the second search performed by Detective Smith after she had returned from the hospital required a search warrant and therefore the items photographed, observed, or seized during this later search were suppressed.

At trial, Officer John testified to entering the apartment with Thomas and observing Blyden motionless in the chair with his head tilted with an apparent gunshot wound to the right side of his head. Officer John testified that he secured the apartment and called emergency responders because Blyden was still breathing, then removed the gun from Blyden's lap and placed it on the bed. Officer John further testified that Thomas told him that he and Hodge had been in his bedroom when they heard a gunshot in the living room and rushed out into the room to find Blyden motionless

in the chair. Officer John also testified that he saw drops of blood outside, leading into the apartment, but no trail of blood inside the apartment.

Detective Smith testified that when she first arrived at the scene, Blyden had already been removed from the apartment and taken to the hospital. Upon walking up to the apartment, Detective Smith testified that she observed what appeared to be blood and brain matter in the driveway leading into the apartment. Detective Smith testified to taking numerous photographs of the crime scene during her initial search, including photographs of the revolver on the bed and the chair Blyden was found sitting in. Detective Smith also testified that she would have expected more "back spatter," or blood, in the area of the chair or the nearby wall if Blyden had indeed shot himself while sitting in the chair. After this initial inspection, Detective Smith indicated that she went to the hospital to collect gunshot residue from the hands of Blyden, Hodge, and Thomas. Detective Smith later returned to the apartment for further inspection and processing, the results of which were suppressed by the Superior Court.

Dr. Francisco Landron, the territorial medical examiner, conducted Blyden's autopsy and testified that the wound on Blyden's head evidenced that he was shot from greater than two feet away, and not within close range. Dr. Landron explained that Blyden's wound was not blackened or seared, which would evidence a gunshot with direct contact with his head. Dr. Landron further explained that Blyden did not have gun powder pitted into his skin around the wound, called tattooing, which would evidence a close-range shot — a shot within two feet. Instead, Blyden's wound indicated that the muzzle of the gun that shot him was from further than two feet away. Therefore Dr. Landron concluded that Blyden could not have shot himself, and ruled Blyden's cause of death a homicide.

Thomas's co-defendant Hodge testified that Blyden's death was a suicide. Hodge testified that he and Thomas were inside the bedroom for several minutes before hearing a gunshot in the living room. Hodge stated that they immediately ran into the living room to find Blyden sitting motionless in a chair and thereupon Thomas called emergency services. However, on cross-examination, Hodge repeatedly stated that he did not see a gun on Blyden's lap when Hodge and Thomas first found Blyden.

Maurice Cooper, a firearms and tool mark expert, testified that he compared the bullet that shot Blyden to an exemplar bullet fired from the revolver found on Blyden's lap and concluded that both bullets were fired

from the same gun. Cooper testified that the firearm's cylinder was out of place for a weapon that should have been recently fired. Cooper also testified that based on his examination of Blyden's wound, the gunshot was fired from at least eight to twelve inches away from his head, because there was no evidence of tattooing or flakes of gun powder around the wound.

Cristal Fredericks, Blyden's sister, testified regarding a beach party she attended on July 29, 2003, where she recalled Thomas showing her a gun he claimed to be his that was a "spin barrel chrome [b]rown handle," similar to the gun found on Blyden's lap by Officer John.

Trial ended on July 27, 2012. The jury acquitted Thomas of all charges except for one count of misprision of felony — involuntary manslaughter (Count eight). The Superior Court entered an October 17, 2012 judgment and commitment sentencing Thomas to six months of imprisonment. Thomas filed a timely notice of appeal on September 21, 2012.[2]

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

This Court has jurisdiction over this appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." It is well established that in a criminal case, the written judgment embodying the adjudication of guilt and the sentence imposed based on that adjudication — here, the October 17, 2012 judgment and commitment — constitutes a final judgment for purposes of this statute. *Percival v. People* 62 V.I. 477, 483 (V.I. 2015) (citing *Cascen v. People*, 60 V.I. 392, 400 (V.I. 2014) and *Williams v. People*, 58 V.I. 341, 345 (V.I. 2013)).

In reviewing the trial court's denial of Thomas's motion to suppress, we review its factual findings for clear error and exercise plenary review

---

[2] Supreme Court Rule 5(b)(1) provides that "[a] notice of appeal filed after the announcement of a decision, sentence, or order — but before entry of the judgment or order — is treated as filed on the date of and after the entry of judgment." Therefore, even though Thomas filed his notice of appeal before the Superior Court entered its judgment and commitment into the docket, it is timely. *See Petric v. People*, 61 V.I. 401, 406 n.3 (V.I. 2014) (citing *Tyson v. People*, 59 V.I. 391, 399 n.5 (V.I. 2013)).

over its legal determinations. *Simmonds v. People*, 53 V.I. 549, 555 (V.I. 2010).

■ "An appellant who challenges the sufficiency of the evidence bears a very heavy burden." *Estick v. People*, 62 V.I. 604, 612 (V.I. 2015) (quoting *Charles v. People*, 60 V.I. 823, 831 (V.I. 2014)) (internal quotation marks omitted). "In reviewing a challenge to the sufficiency of the evidence presented at trial, we must view the evidence in the light most favorable to the People, and affirm the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Webster v. People*, 60 V.I. 666, 678-79 (V.I. 2014) (quoting *Cascen*, 60 V.I. at 401). A challenge to the sufficiency of the evidence is not a vehicle to relitigate credibility arguments that were unpersuasive to a jury. *Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009).

## B. Sufficiency of the Evidence

■ Thomas argues that there is insufficient evidence to uphold his conviction of misprision of a felony. We disagree. This Court has previously outlined the three essential elements the People must prove in order to establish the crime of misprision of a felony under 14 V.I.C. § 13: "(1) the principal committed and completed the felony alleged; (2) the defendant had full knowledge of that fact; [and] (3) the defendant took an affirmative step to conceal the crime." *Percival v. People*, 61 V.I. 187, 199 (V.I. 2014).

■ At trial, the People presented sufficient evidence for a rational trier of fact to conclude that Blyden's death was a result of an involuntary manslaughter and not a suicide. In fact, the circumstantial evidence supports a finding that Blyden was shot outside the house and subsequently brought inside and placed upright in a chair with a firearm on his lap. The expert evidence of the medical examiner and autopsy report concluded that the gunshot wound to Blyden's head was the result of a shot not taken at close range, i.e., from more than two feet away, and that the manner of death was a homicide. There were no powder burns or gunshot residue to the head area of the wound, as would be present from a close-range self-inflicted gunshot. Testimony further revealed that blood and brain matter was found directly outside the apartment leading into the home. There was also testimony from Detective Smith indicating that more blood splatter should have been present on the wall and the chair where Blyden was found, if indeed he had shot himself in that location.

Furthermore, Cristal Fredericks, Blyden's sister, testified that on July 29, 2003, Thomas showed her a gun he claimed to be his that was a "spin barrel chrome [b]rown handle," similar to the gun found at the scene. Lastly, there was testimony that the bullet that shot Blyden was fired from the revolver found on Blyden's lap.

■ Although this is not overwhelming evidence establishing that Blyden's death was an involuntary manslaughter, given our sufficiency-of-the-evidence standard of review — viewing the evidence in the light most favorable to the People — a rational trier of fact could certainly determine that Blyden was the victim of an involuntary manslaughter, in an accidental shooting by someone as a result of an unsecured firearm, as charged. *Codrington v. People*, 57 V.I. 176, 194 (V.I. 2012) (stating that a defendant can be guilty of involuntary manslaughter under 14 V.I.C. § 924 by unlawfully killing a human being, without malice aforethought, by the culpable omission of some legal duty). Thus, the first element of misprision is met.

The evidence also supports a finding that Thomas was aware of the felony and sought to conceal the crime. Officer John testified that Thomas informed him that he and Hodge were in a back bedroom and immediately came out of the bedroom upon hearing a gunshot and observed Blyden sitting upright in the chair with a gun on his lap. Hodge's testimony corroborated much of Thomas's statement, except Hodge was emphatic that he did not see a gun present on Blyden's lap. If the jurors credited Hodge's testimony that he never saw a gun in Blyden's lap and that Hodge and Thomas were the only people in the house aside from Blyden, along with the autopsy report and other forensic testimony, and Fredericks's description of Thomas's gun, then a rational jury could certainly conclude that Blyden died as a result of a homicide, that Thomas actively lied to the authorities when he called emergency services multiple times and reported that Blyden killed himself, and that Thomas may have even placed the gun on Blyden's lap to bolster his suicide claim and conceal the homicide.

In fact, the jury's decision to acquit Thomas of the involuntary manslaughter charge but convict him of misprision of a felony would support the theory that the jury credited Hodge's testimony that he and Thomas were both in another room when a gunshot was fired, but that no gun had been on Blyden's lap when they found him motionless in the chair. Therefore, under the applicable standard of review, there was

sufficient evidence presented to support a finding that Thomas was guilty of misprision of a felony in conformance with our holding in *Percival. See also United States v. Hodges*, 566 F.2d 674, 675 (9th Cir. 1977) (making an untruthful statement to conceal an offense is an affirmative act sufficient to sustain a misprision charge); *United States v. Pittman*, 527 F.2d 444, 444-45 (4th Cir. 1975) (same); *United States v. Williams*, No. 07-6358, 2009 U.S. App. LEXIS 4921, *9 (6th Cir. Mar. 9, 2009) (unpublished) (finding no constitutional error in convicting an individual of misprision of a felony on the basis of false statements made to the authorities).

### C. VIPD's Actions Violated Thomas's Fourth Amendment Rights

■ Thomas argues that the VIPD's warrantless search of his home violated his Fourth Amendment rights against unreasonable searches and seizures.[3] "It is beyond debate that individuals have a reasonable expectation of privacy in their homes." *Simmonds*, 53 V.I. at 555. In this case, it is also beyond debate that Thomas resided in the apartment where Blyden was shot and therefore had a reasonable expectation of privacy there. Hence, Thomas is afforded Fourth Amendment protection regarding this area.

■ A search or seizure of a residence without a warrant is *per se* unreasonable absent the applicability of one of a few, well-delineated exceptions. *Browne v. People*, 56 V.I. 207, 217 (V.I. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). Thomas concedes that the initial search of his apartment, performed by Officer John, was valid under one of the exceptions to the warrant requirement, the exigency doctrine. *Simmonds*, 53 V.I. at 559-60; *see also Mincey v. Arizona*, 437 U.S. 385, 393-94, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) ("[T]he exigencies of the situation [may] make the needs of law enforcement so compelling that the warrantless search is objectively reasonable."). One such exigency is "the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). In this case, Officer John, responding to Thomas's multiple

---

[3] The Fourth Amendment to the United States Constitution, which protects persons, houses, papers, and effects, against unreasonable searches and seizures, is made applicable to the Virgin Islands pursuant to section 3 of the Revised Organic Act of 1954. 48 U.S.C. § 1561.

calls to emergency services, entered the apartment and saw Blyden still breathing on the chair with a gunshot wound to his head and gun on his lap. Officer John clearly had a right to enter and search Thomas's apartment for the limited purpose of rendering aid without a search warrant because of the exigent circumstances.[4] *Id.*

■ ■ However, once the emergency medical technicians arrived at Thomas's apartment, removed Blyden from the apartment, and took him to the hospital, the exigent circumstances that permitted the initial warrantless entry and associated search of Thomas's apartment ceased. A search justified by the exigency doctrine "must be strictly circumscribed by the exigencies which justify its initiation." *Mincey*, 437 U.S. at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). When Detective Griffith arrived on the scene, Thomas, Hodge, and Blyden had already left the premises and were at the hospital. Officer John had already permissibly performed "a prompt warrantless search of the area to see if there [we]re other victims or if a killer [wa]s still on the premises." *Mincey*, 437 U.S. at 392. There was also no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant, because the police had secured Thomas's apartment. *Id.* at 394. Therefore, there was no exigent circumstance in this case that would permit a warrantless search of Thomas's apartment after Thomas, Blyden, and Hodge left the premises.

■ The Superior Court offered two justifications for the initial search of Thomas's apartment conducted by Detective Smith. First, it reasoned that the search was valid because police obtained reasonable belief that there was evidence of a crime on the premises and reasonable belief that evidence would be lost if not preserved. However, there is no "murder scene exception" to the warrant requirement of the Fourth Amendment. *Id.* at 394-95; *see also Flippo v. West Virginia*, 528 U.S. 11, 14, 120 S. Ct. 7, 145 L. Ed. 2d 16 (1999) (recognizing that there is no murder scene

---

[4] We note that although Officer John did not do so, during this initial search, Officer John had the right to seize any evidence — such as the gun on Blyden's lap — under the plain-view doctrine. The plain-view doctrine allows a law enforcement officer to make a warrantless seizure of any item that he or she has viewed from a place or position in which he or she was lawfully entitled to be, provided it is immediately apparent that the item observed is evidence of a crime, contraband, or otherwise subject to seizure. *See Texas v. Brown*, 460 U.S. 730, 741, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983); *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

exception to the Fourth Amendment). "No exigency is created simply because there is probable cause to believe that a serious crime has been committed." *Welsh v. Wisconsin*, 466 U.S. 740, 745, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984) (citation omitted). Therefore, despite this case involving a potential homicide, the seriousness of the offense does not create exigent circumstances. *Mincey*, 437 U.S. at 394.

 Additionally, the exception for a warrantless search based on the threat of destruction of evidence is only permitted if the police believe they must act immediately because of an imminent risk of evidence being removed or destroyed. *Cupp v. Murphy*, 412 U.S. 291, 296, 93 S. Ct. 2000, 36 L. Ed. 2d 900 (1973); *see also Missouri v. McNeely*, 133 S. Ct. 1552, 1559, 185 L. Ed. 2d 696 (2013). In this case, there was simply no evidence that the police or detectives believed they had to act immediately to prevent the destruction of evidence. In fact, all of the circumstances point to the contrary, as the apartment was secured by the VIPD. It was at this point, having secured the apartment area, that the VIPD should have obtained a search warrant if they desired to conduct additional searches.

 The second justification that the Superior Court "adopt[ed] to some extent," was the People's argument that Thomas implicitly consented to the search because he left his apartment while the police were still present on the premises. Consent to a search is another valid exception to the warrant requirement. *Simmonds*, 53 V.I. at 559-60; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). However, we find no evidence in the record to support a finding that Thomas ever, actually or implicitly, consented to a search of his apartment.

 If a person gives free and voluntary consent to search, a warrantless search is considered constitutionally valid and whether consent was freely and voluntarily given is determined by looking at the totality of the circumstances surrounding the consent. *Schneckloth*, 412 U.S. at 227. To justify a search based on consent, the Government "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968). This burden "is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983).

In this case, Thomas left with Blyden's mother and Hodge to go to the hospital to check on Blyden's health status. The act of Thomas leaving his apartment to go to the hospital cannot be said to convey free and voluntary consent to having his apartment searched without a warrant. In *Thompson v. Louisiana*, 469 U.S. 17, 21, 105 S. Ct. 409, 83 L. Ed. 2d 246 (1984), the Supreme Court of the United States explained that a defendant's attempt to get medical assistance, leaving the area protected by the Fourth Amendment, did not evidence a diminished expectation of privacy on the defendant's part:

> Petitioner's attempt to get medical assistance does not evidence a diminished expectation of privacy on her part. To be sure, this action would have justified the authorities in seizing evidence under the plain-view doctrine while they were in petitioner's house to offer her assistance. In addition, the same doctrine may justify seizure of evidence obtained in the limited "victim-or-suspect" search discussed in *Mincey*. However, the evidence at issue here was not discovered in plain view while the police were assisting petitioner to the hospital, nor was it discovered during the "victim-or-suspect" search that had been completed by the time the homicide investigators arrived. Petitioner's call for help can hardly be seen as an invitation to the general public that would have converted her home into the sort of public place for which no warrant to search would be necessary.

*Id.* at 22. Similar to the defendant in *Thompson*, Thomas's act of leaving his apartment to go to the hospital cannot be interpreted as consent to convert his apartment to a public place where no search warrant is necessary. This is especially true given the fact the VIPD had fully secured Thomas's apartment, and thus had ample time to obtain a search warrant. *See Walter v. United States*, 447 U.S. 649, 657, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980) (search unreasonable where warrant was easily obtainable); *Mincey*, 437 U.S. at 394 (no indication that authorities could not have easily obtained search warrant); *McDonald v. United States*, 335 U.S. 451, 454-55, 69 S. Ct. 191, 93 L. Ed. 153 (1948) (no reason for failure to obtain warrant).

Hence, all of the evidence obtained after Blyden was removed from his apartment and Thomas left to go to the hospital should have been suppressed because the VIPD never obtained a search warrant and no valid exception to the warrant requirement existed. When evidence is obtained as a result of an unconstitutional search, the exclusionary rule

requires that the fruits of that search be excluded from evidence at trial. This unconstitutionally obtained evidence includes all of the photographs taken of the crime scene, Detective Smith's testimony on what she observed in and around the house, *see Simmonds*, 53 V.I. at 556 (observing that "[t]he Fourth Amendment's shield from unreasonable government intrusion . . . extends to the curtilage"), her observations regarding the gun, and any physical evidence obtained from the house, including the gun itself since it was seized during Detective Smith's illegal search.[5] Maurice Cooper's expert testimony was also inadmissible as the product of the illegal search because his testimony was based entirely on his examination of the evidence obtained during the illegal search. *Id.* at 561; *see also Murray v. United States*, 487 U.S. 533, 536-37, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988) ("The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search. . . . Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence . . . that is otherwise acquired as an indirect result of the unlawful search.").

 Nevertheless, as dictated by Supreme Court Rule 4(i), this Court must first consider whether in the context of this particular case, the error of admitting improperly obtained evidence is harmless. "An evidentiary error is harmless if, after reviewing the entire record, [the court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict." *Frett v. People*, 58 V.I. 492, 506 (V.I. 2013) (quoting *Browne v. People*, 56 V.I. 207, 226 (V.I. 2012)). But "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Frett*, 58 V.I. at 506 (internal

---

[5] Officer John testified that he observed the gun in Blyden's lap when he entered the house, and moved it to the bed to secure it. This was within Officer John's plain view upon his legal entry into the house, and therefore he could have seized the gun at that point in time. *Mincey*, 437 U.S. at 393 ("[P]olice may seize any evidence that is in plain view during the course of their legitimate emergency activities."). But he did not, and while his observation of this weapon — in addition to anything else he might have seen during the course of rendering emergency aid — could have been used to support probable cause for a warrant, this alone did not allow police to later return to the house and retrieve the gun without a warrant. *See People v. Keener*, 148 Cal. App. 3d 73, 195 Cal. Rptr. 733, 735 (1983) (holding that even though police observed a gun upon their first lawful entrance and could have seized it, once the emergency had ended and police left the house, they could not reenter to seize the gun without a warrant).

quotation marks and citation omitted). "In reviewing a constitutional error for harmlessness, the burden is on the beneficiary of the error to make a showing that the error was harmless beyond a reasonable doubt." *Rawlins v. People*, 61 V.I. 593, 611 (V.I. 2014).

However, the People failed to file a brief in this case and therefore we cannot find that it satisfied its burden of showing that the evidence admitted from the illegal search was harmless beyond a reasonable doubt. *Rawlins*, 61 V.I. at 610-11 (the People's failure to file a brief prevented the Court from holding that the constitutional error was harmless); *Frett*, 58 V.I. at 507 (the People's failure to address "the critical question" on appeal of whether a constitutional error was harmless beyond a reasonable doubt could, without more, lead the Court to hold that the error was not harmless, and the People did not even try "to carry their burden of showing harmless error").

■■ Nevertheless, even had the People attempted to meet its burden, we would still conclude that the error could not have been "harmless beyond a reasonable doubt." *Frett*, 58 V.I. at 506-08. As explained above, much of the evidence introduced against Thomas at trial was either illegally obtained or derived from what had been illegally obtained, including Detective Smith's testimony, the photographs of the crime scene she took during her illegal search, the gun itself, and Cooper's expert testimony. *Id.* at 509 ("Whenever improper evidence becomes so prominent a feature of the trial, a court cannot find that the error was harmless beyond a reasonable doubt." (quoting *Ellis v. State*, 622 So. 2d 991, 998 (Fla. 1993))).

■ We recognize that Officer John lawfully searched the apartment while an exigency was present, and testified to seeing a gun on Blyden's lap, which could arguably render some of the inadmissible evidence cumulative. However, "[e]vidence is cumulative when it supports a fact already established by existing evidence; adds very little to the probative force of the other evidence in the case; [or] is merely a repetition of previous testimony." *Brown v. Smith*, 551 F.3d 424, 433-34 (6th Cir. 2008). In this case, we cannot say that Detective Smith's testimony was merely cumulative of Officer John's. *See Vasquez v. Jones*, 496 F.3d 564, 576 (6th Cir. 2007) ("The mere fact that one other witness . . . has testified to a particular fact . . . does not render other testimony on that point 'cumulative.' "). At trial, Officer John expressly stated that all he did was move the revolver from Blyden's lap to the bed, and that he did nothing

else with the gun. He testified that he suspected that Blyden's death might not have been a suicide because he was suspicious of how the gun was resting on his lap and had seen "little drops" of blood outside the apartment.

During her testimony, Detective Smith corroborated portions of Officer John's testimony, including his claim that blood drops were present outside the apartment. However, during cross-examination, Thomas's counsel had cast some doubt on portions of Officer John's testimony, eliciting admissions from him that (1) it was possible blood could have been transferred from inside the apartment to the outside through crime-scene contamination; (2) he had failed to mention these drops of blood in his contemporaneous report; (3) he had failed to photograph the blood droplets; and (4) he reported Blyden's death as an attempted suicide after arriving at the crime scene. But since Detective Smith's testimony, which was based on the illegal search, rehabilitated these portions of Officer John's testimony by providing independent corroboration, her testimony cannot be characterized as being cumulative. *See Vasquez*, 496 F.3d at 576 ("potential bolstering [of other testimony] weighs against finding harmless error"); *accord Arizona v. Fulminante*, 499 U.S. 279, 299, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (holding that "the jury might have believed that the two confessions reinforced and corroborated each other" in determining that an inadmissible confession was not cumulative to another confession that was properly admitted).

In any case, Detective Smith also provided additional — and more powerful — testimony that cannot be described as cumulative of Officer John's testimony. She testified that upon entering the apartment, she unloaded the revolver, and observed that there were three live rounds and one spent shell casing in the cartridge. She explained that the configuration of the spent casing and the live rounds was unusual because the spent casing was out of position, and that there was no way it could have been placed in that wrong position other than by a human hand. She also explained that she had examined the chair that Blyden had been found seated in, and stated that she saw nothing of forensic interest, which was inconsistent with a suicide, since if Blyden had shot himself in that chair, there should have been "more of a back spatter in the area or even nearby on the wall that was nearest to the chair." She further testified that she had found blood on the television screen, which also could not have been back splatter. All of this testimony, if credited by the jury, would

strongly support the People's theory that Blyden did not commit suicide but had been shot by someone else, that Blyden's body had been moved from the original location of the shooting and the gun placed in his lap, and that Thomas lied when he called emergency services and reported Blyden's presumed death as a suicide. In the absence of Detective Smith's testimony, it may well have been the case that the jury could certainly have concluded — based on the effectiveness of Thomas's cross-examination of Officer John — that Blyden's death was a suicide, and found Thomas not guilty of misprision. Therefore, we must remand for a new trial.

### III. CONCLUSION

Accordingly, we conclude that there is sufficient evidence to uphold Thomas's conviction of misprision of a felony. But, after Thomas, Blyden, and Hodge left the apartment, the VIPD were required to obtain a search warrant to enter and search the premises, as the exigent circumstances permitting their initial entry, and the search undertaken concomitant thereto, ceased. This Court cannot conclude that this violation of Thomas's Fourth Amendment right was harmless since the People failed to meet its burden of showing that the error was harmless beyond a reasonable doubt. Therefore, we vacate the Superior Court's October 17, 2012 judgment and commitment and remand for a new trial.

SWAN, *Associate Justice*, concurring in the judgment in part and dissenting in part. The Appellant, D'Sean Thomas, was convicted of one count of misprision of a felony. Because there was insufficient evidence for a conviction of misprision of a felony and because the trial court erred in denying the Appellant's motion to suppress evidence, Appellant's conviction should be vacated.

### I. FACTS AND PROCEDURAL HISTORY

At about 1:37 a.m. on July 5, 2011, D'Sean Thomas called 9-1-1 and reported that his cousin and roommate, Jamal Blyden, had committed suicide by shooting himself in the head. Thomas then called 9-1-1 a second time before police officers arrived on the scene. Officers Nigel John and Adelbert Molyneaux were the first police responders on the scene. Upon arrival, they encountered Thomas and a neighbor, Rashidi Hodge, sitting outside of the residence in Estate Tutu where the shooting occurred. As the two officers approached the house, Officer Molyneaux

observed blood in the driveway and remained outside while Officer John entered the house. Upon entering, Officer John discovered Blyden sitting upright in a chair with a bullet wound to the right side of his head. He also observed Blyden gasping for air with a firearm resting on his lap. For safety reasons, Officer John removed the firearm from Blyden's lap and placed it on a nearby bed.

At the scene, Thomas informed Officer John that he and Hodge were in the rear bedroom of the house when they heard a gunshot. Thomas further stated that they both hurried into the living room where they found Blyden sitting motionless in a chair. Thomas recalled that Blyden had complained that he and his girlfriend were having problems.

Emergency medical technicians arrived at the scene and transported Blyden to the hospital, where he succumbed to his gunshot wound. After Thomas and Hodge proceeded to the hospital, additional police officers and detectives arrived on the scene. The officers secured the area and began gathering information and evidence concerning the shooting. Thomas and Hodge were later escorted to the Police Intelligence Office in Barbel Plaza where they were interviewed regarding Blyden's death. Gunshot residue tests were administered to Thomas's and Hodge's hands and clothing.

Detective Shani Smith conducted a forensic crime scene examination later that morning, during which she observed blood on the rug and on the right side of the chair where Blyden was found sitting. She examined the firearm that Officer John had removed from Blyden's lap and subsequently determined that the spent shell casing was out of position for a recently discharged firearm.

Based on the forensic evidence gathered during the approximately 8 hour search of Thomas's residence, the People charged Thomas with preparing false evidence, involuntary manslaughter, one count of misprision of felony and other crimes. Relying on the seized items from the home, the People presented evidence from forensic pathologist, Dr. Francisco Landron, who testified that based on his autopsy findings, Blyden's death was a homicide.

Although Thomas did not testify, his co-defendant Hodge testified that Jamal Blyden's death was a suicide. Hodge further testified that he and Thomas were inside the bedroom for several minutes, before hearing a gunshot in the living room. He stated that they immediately entered the

613

living room to find Blyden motionless in a chair and thereupon Thomas called 9-1-1 immediately.

The jury acquitted Thomas of all charges except for one count of misprision of felony. This appeal ensued. On appeal, Thomas propounds two issues: (1) that the evidence was insufficient to convict him and (2) that the Superior Court erred in denying his motion to suppress evidence collected during a warrantless search of his home.

## II. STANDARD OF REVIEW

A trial court's evidentiary rulings are reviewed for abuse of discretion. *Francis v. People*, 56 V.I. 370, 379 (V.I. 2012); *United States v. Goldin*, 311 F.3d 191, 197 (3d Cir. 2002). "In reviewing the trial court's decision on [a] motion to suppress, 'we review its factual findings for clear error and exercise plenary review over its legal determinations.' " *Blyden v. People*, 53 V.I. 637, 646-47 (V.I. 2010) (quoting *People v. John*, 52 V.I. 247, 255 (V.I. 2009) and *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006)). We review the trial court's finding of whether the defendant consented to a warrantless search under the clearly erroneous standard. *See, e.g., In re Estate of Small*, 57 V.I. 416, 430 (V.I. 2012) (identifying the standard for holding a finding of fact to be clearly erroneous); *see also Williams v. People*, 55 V.I. 721, 731 (V.I. 2011) (defining consent as the "acquiescence by a person of age or with requisite mental capacity who is not under duress or coercion").

Additionally, when this Court is presented with a challenge to the sufficiency of the evidence, we will " 'examine the totality of the evidence, both direct and circumstantial,' and 'interpret the evidence in the light most favorable to the government as the verdict winner.' " *United States v. Pavulak*, 700 F.3d 651, 668 (3d Cir. 2012) (quoting *United States v. Starnes*, 583 F.3d 196, 206, 52 V.I. 1051 (3d Cir. 2009) and *United States v. Miller*, 527 F.3d 54, 60, 62 (3d Cir. 2008)). If " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,' " we will affirm. *DeSilvia v. People*, 55 V.I. 859, 865 (V.I. 2011) (quoting *Mendoza v. People*, 55 V.I. 660, 666-67 (V.I. 2011)).

## III. DISCUSSION

### A. Sufficiency of the Evidence

Thomas was convicted of 14 V.I.C. § 13[1] for concealing the commission of a felony — involuntary manslaughter — under 14 V.I.C. § 924(2). This Court has set forth the history and requirements of the crime of misprision of a felony in *Percival v. People*, 61 V.I. 187 (V.I. 2014). The Virgin Islands misprision statute was modeled after federal statute 18 U.S.C. § 4. "However, because the federal and Virgin Islands statutes differ on the material point of the obligation to notify authorities," we have held "that the three elements that the Virgin Islands Legislature clearly codified in § 13 are: (1) the principal committed and completed the felony alleged; (2) the defendant had full knowledge of that fact; [and] (3) the defendant took an affirmative step to conceal the crime." *Percival*, 61 V.I. at 198-99. Under these elements, the evidence in this case is unquestionably insufficient to convict Thomas of misprision of a felony.

In reviewing the misprision test, it appears that the majority misapplies the facts of this case and ultimately places Thomas in the position of both principal and defendant under the three pronged test. As noted above, the People must prove beyond a reasonable doubt that "(1) the *principal* committed and completed the felony alleged, that (2) the *defendant* had full knowledge of that fact; [and] (3) the *defendant* took an affirmative step to conceal the crime." *Id.* (emphasis added). In *United States v. White Eagle*, 721 F.3d 1108 (9th Cir. 2013), the court held that a prosecution or conviction for *a third party's offense* was not a prerequisite for a misprision conviction. Therefore, it would logically follow that the principal in any misprision test is in fact a third party separate and apart from the defendant charged. Here, the majority creates a paradigm where the first element of the misprision test can only be satisfied with Thomas as the principal that commits involuntary manslaughter.

While there was some evidence that Blyden's death may not have been the result of a suicide, I cannot conclude that the People presented any evidence that a principal committed and completed involuntary manslaughter that resulted in Blyden's death. Through the testimony of

---

[1] This statute, establishing the offense of misprision of felony, states "Whoever, having knowledge of the actual commission of a felony, willfully conceals it from the proper authorities, shall be fined not more than $500 or imprisoned not more than 3 years, or both."

Thomas's cousin, Cristal Frederick, the People inferred that the firearm found on Blyden's lap was the same firearm that Frederick saw Thomas with nine years prior to trial. However, there is no evidence in the trial record to support a finding that it was indisputably the same firearm. Nonetheless, even if I were to agree with the majority that involuntary manslaughter was committed as the result of an unsecured firearm, I cannot go further in finding that Thomas served as the principal that failed to secure said firearm, thereby committing involuntary manslaughter. In essence, to meet the requirements of the misprision test, the majority requires that Thomas serve as the principal that owned a firearm that he left unsecured and that he also serve as the defendant that had full knowledge that he left his own firearm unsecured and that he took affirmative steps to conceal the fact that he left his own firearm unsecured. Because the first element of the misprision test necessarily requires a finding that a principal committed and completed the felony alleged, I do not find that this element was met.

Additionally, it is apparent that the evidence failed to support a finding that Thomas had the requisite knowledge that a felony occurred. *See Percival*, 61 V.I. at 199 (the crime of misprision of a felony in the Virgin Islands requires proof beyond a reasonable doubt that "the defendant had full knowledge of that fact"). Again, while a reasonable juror could deduce that Blyden's death was not a suicide due to expert testimony regarding blood spatter patterns inconsistent with suicide, blood and brain matter found outside of the apartment, and a gunshot not taken at close range, the evidence still cannot support Thomas's culpability for misprision of a felony. Black's Law Dictionary defines knowledge as an awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact. BLACK'S LAW DICTIONARY 950 (9th ed. 2009). There is no direct or circumstantial evidence to support a finding by the trier of fact that Thomas was aware or had knowledge of any felony resulting in Blyden's death when his co-defendant, Rashidi Hodge, testified to being in a separate bedroom with Thomas at the time of Blyden's death. The trial record also fails to prove how Thomas had knowledge of the omission of any legal duty which resulted in Blyden's death. Thomas's presence in his home cannot suffice as prima facie evidence for knowledge to a crime. Therefore, I conclude that the People were unable to prove beyond a reasonable doubt the second element in the misprision test.

Finally, the third element of misprision requires that "the defendant took an affirmative step to conceal the crime." *Percival*, 61 V.I. at 199. The trial record undeniably and irrefutably confirmed that Thomas personally endeavored to promptly and immediately notify the police authorities that Blyden had suffered a gunshot to his head and that he appeared to be dying as a result thereof. According to the testimony of Carolyn Wattley, District manager of the Virgin Islands Territorial Emergency Management Agency, the first 9-1-1 call from Thomas was made at 1:37 a.m. on July 5, 2011, detailing that his cousin had committed suicide. Thomas made a second call to 9-1-1 at 2:00 a.m. confirming the time that the shooting occurred. Additionally, when Officer John arrived on the scene he observed Blyden still breathing although Blyden had been shot on the right side of his head. In addition to Thomas's two calls to 9-1-1, Thomas waited at the scene, where he answered several questions by law enforcement on the night of the shooting, and continued to cooperate with law enforcement throughout the night.

However, a reasonable jury could presume that Thomas's willingness to cooperate with law enforcement was in and of itself an act of willful concealment of a crime. Courts have found that the giving of a false statement to police officials is sufficient evidence to show an act of concealment to sustain a conviction for misprision of a felony. *United States v. Hodges*, 566 F.2d 674, 675 (9th Cir. 1977). Nevertheless, in cases finding an act of concealment, there has been additional evidence to prove that the defendant willfully concealed a felony when giving such statements.[2] It is unmistakable that no such evidence exists in this case. Any attempts to find that Thomas's statements to police were efforts of willful concealment of a felony would be absolute conjecture and speculation. Moreover, an element of a crime should not be proven through what the trier of fact perceives as a possible ulterior motive of a defendant. Either the evidence of the elements of a crime exists or it does

---

[2] For instance, in *Hodges*, the state proved that the defendant lied and told federal agents that he had never seen a child that had been kidnapped and did not know the whereabouts of the kidnapper. However, his statements were viewed as an act of concealment because additional evidence showed that prior to the statements given to law enforcement officials, the defendant had traveled to Arizona where he observed the child with the kidnapper. Furthermore, subsequent to his interview with law enforcement officials, more evidence was introduced showing that the defendant informed the kidnapper of the agent's inquiry and suggested that the kidnapper get rid of the child. *Hodges*, 566 F.2d at 675-76.

not. Therefore, I conclude that the People also failed to prove the third element of misprision of a felony.

The record is scant regarding Thomas's knowledge of a felony and any willful concealment of that felony. The reporting of a shooting does not constitute a crime. Additionally, Thomas's mere presence in the home is not sufficient to warrant a conviction when he resided in the home and, therefore, was lawfully in the home at the time of Blyden's death. Improperly construing his presence inside of his own home as him having full knowledge of a felony would eliminate the People's burden of proving the crime beyond a reasonable doubt. It is undeniable that from the trial record, no rational trier of fact could have found all of the essential elements of the crime of misprision of a felony. This court has previously held that speculation is not a substitute for evidence. *Hughes v. People*, 59 V.I. 1015, 1020 (V.I. 2013) (holding that the evidence is insufficient where a conviction would require the jury to pile inference upon inference). In a similar case, this Court has said that the misprision statute "does not require that the perpetrator be convicted of a felony, only that the defendant knows that a felony was committed and, by an affirmative act, willfully conceals it." *Percival*, 61 V.I. at 200 n.13. Therefore, I conclude that not all the elements for misprision of a felony were satisfied.

### B. Warrantless Entry and Subsequent Search

Notwithstanding the insufficiency of the evidence on Thomas's conviction of misprision of a felony, I still find it necessary to address the basic constitutional violations found in this case. The Fourth Amendment to the United States Constitution affords protection against unreasonable searches and seizures and ensures that an individual's home cannot be searched without a warrant or probable cause. "[A] search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show the presence of exigent circumstances." *Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)). A warrantless search is presumed to violate an individual's rights unless the government agency can prove a clear exception to the warrant requirement. "Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome

the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh*, 466 U.S. at 750 (citing *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)).

There are circumstances which "may make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). Applicable to this case, an exigency that has been recognized by the Supreme Court of the United States is "the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). Thus, law enforcement officers "may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* This "emergency aid exception" does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. *Id.* at 404-05. It requires only "an objectively reasonable basis for believing," *id.* at 406, that "a person within [the house] is in need of immediate aid," *Mincey*, 437 U.S. at 392. *See also Michigan v. Fisher*, 558 U.S. 45, 47, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009). Here, it is evident that officers had a basis to enter Thomas's home for the purpose of assisting Blyden, who was suffering from a gunshot wound to the head. It is also noteworthy that authorities may seize any evidence in plain view during the course of their legitimate exigent or emergency activities. *Mincey*, 437 U.S. at 393.

Although officers initially had a legitimate basis to be in the home, the exigency that originally necessitated the warrantless entry and search of the house ended after it became obvious that there were no conditions which could present a danger to any person. When the Arizona Supreme Court attempted to create a "crime scene exception" to the Fourth Amendment's warrant requirement, the United States Supreme Court explicitly ruled that there is no murder scene exception to the Fourth Amendment and that a warrantless search of a person's home "was not constitutionally permissible simply because a homicide had recently occurred there." *Mincey*, 437 U.S. at 395. *See also Flippo v. West Virginia*, 528 U.S. 11, 14, 120 S. Ct. 7, 145 L. Ed. 2d 16 (1999).

Here, after the residence was initially inspected and secured by the first responders on the scene, it was obvious that there were no other victims beside Blyden inside the home. At this juncture, no exigency existed that

would have permitted police authorities' continued presence in Thomas's home without a warrant. At trial, the People stipulated that no warrant was issued to search the house and therefore, there was no valid justification for their continued presence in the home. The fact that the residence was a possible crime scene presented probable cause upon which a search warrant could have been obtained. The United States Third Circuit Court of Appeals has clearly stated that in order to enter a residence without a warrant for a "second search" officers had to have a rational basis for believing exigent circumstances existed. *Parkhurst v. Trapp*, 77 F.3d 707, 712-13 (3d Cir. 1996). By securing the crime scene, Officer John made it unlikely that evidence would have been lost or destroyed during the time it would take to obtain a valid search warrant.

Still, in addition to legitimate exigent circumstances, a warrantless search may be conducted when an individual, with authority to do so, voluntarily consents to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). A voluntary consent to a warrantless search constitutes a waiver of one's Fourth Amendment rights. *See id.* at 235. A court must analyze all the circumstances to ascertain whether an individual's consent was voluntary or coerced. *Id.* at 233. It is the government's burden to prove consent was voluntarily given. *Id.* at 222, 248-49.

While I agree that Thomas's 9-1-1 calls constituted consent for officers to initially enter the residence to investigate the allegations of a suicide, I am unable to agree with the trial court's conclusion that police officials had Thomas's consent to be in the home after Thomas had departed and had proceeded to the hospital with Hodge. A consent search cannot reasonably exceed the scope of the consent given. *See United States v. Yong Hyon Kim*, 27 F.3d 947, 956 (3d Cir. 1994) (citing *Walter v. United States*, 447 U.S. 649, 656, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980)). The standard for measuring the scope of consent under the Fourth Amendment is that of " 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991) (citing cases).

Despite the limitations of consent, the trial court concluded that Thomas voluntarily relinquished "his reasonable expectation of privacy when he called [9-1-1] not once but four times to request assistance after the shooting of [Blyden]." *See generally Stricker v. Twp. of Cambridge*,

710 F.3d 350, 359 (6th Cir. 2013) (holding that evidence of a 9-1-1 call soliciting response from an emergency team weighs in favor of finding that a defendant had a diminished expectation of privacy in his home). Also, a 9-1-1 call for assistance could justify authorities seizing evidence under the plain view doctrine while authorities are assisting an injured person, or the seizure of evidence conducted during a limited victim-or-suspect search. *Thompson v. Louisiana*, 469 U.S. 17, 22, 105 S. Ct. 409, 83 L. Ed. 2d 246 (1984).

Nevertheless, it is not objectively reasonable to conclude that Thomas's 9-1-1 calls can be construed as consent for an 8-hour search of his premises with a continuous influx of officers and detectives. This unreasonableness is particularly telling since Thomas was absent from the premises for most of that period, and thus could not view or object to any conduct he deemed unreasonable. "[A] call for help can hardly be seen as an invitation to the general public that would [convert a] home into the sort of public place for which no warrant to search would be necessary." *Id.*

Accordingly, the second search of Thomas's residence, which commenced more than 8 hours after the first search ended, when there were no valid exceptions to the Fourth Amendment's warrant requirement, was a blatant violation of Thomas's constitutional rights. The evidence gathered during this prolonged search was utilized by the People's experts in their determination of whether Blyden's death was a homicide rather than a suicide, and also as a basis for an arrest warrant against Thomas. Furthermore, the trial record is unequivocal as to the time frame regarding when the evidence was gathered from the residence. Detective Smith testified that she took photographs and seized the firearm and shell casings on her second search of the residence. It is the People's burden to prove that evidence obtained without a warrant is anchored within a valid exception to the warrant requirement. Here, the People failed to meet this burden. The only portion of the warrantless search that was legal was the search conducted by Officer John when he first responded to Thomas's call for assistance. The firearm found on Blyden's lap is also the only evidence that may be construed as being recovered under the "plain view" doctrine. While Officer John observed blood in the vicinity of Blyden, the photographs of this blood and the surrounding area were not taken until after Blyden was taken to the hospital and when any exigency was diminished or terminated. There were numerous

photographs of the residence, of the location of Blyden's blood, of brain matter, of a firearm, and of shell casings that were shown to the jury. However, these photographs were taken during the warrantless search of the residence that occurred well after any exigency had expired, and therefore are fruits of the illegal search. "When evidence is obtained as a result of an unconstitutional search, the exclusionary rule requires that the fruits of that search be excluded from evidence at trial." *Simmonds v. People*, 53 V.I. 549, 561 (V.I. 2010) (citing *United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002)). Here, the fruits of the illegal search were presented to the jury.

Detective Smith testified that by the time she arrived at Thomas's residence, there were no other possible victims or suspects since Thomas and Blyden had already vacated the house. There was clearly no exigency when Detective Smith arrived at the home, nor was there any consent to justify her presence in the house to conduct a warrantless search.

The People failed to meet their burden in providing a valid justification for the warrantless search of Mr. Thomas's residence; therefore, the trial court should have suppressed evidence obtained from this illegal search.

Finally, as a procedural matter, an individual has standing to challenge a warrantless search and seizure when there is a reasonable expectation of privacy. For example, a defendant had a reasonable expectation of privacy in premises where he "had been staying . . . earlier in the week . . . and kept some personal belongings in a closet in the living room," and was permitted to be in the home while the owners were absent. *United States v. Pollard*, 215 F.3d 643, 647-48 (6th Cir. 2000). Neither party disputes that Thomas moved in with Jamal Blyden just a few weeks prior to the shooting incident, and thus lived at the residence at the time of the shooting. Based on the trial record, any contention to the contrary would be meritless.

## IV. CONCLUSION

For the reasons elucidated above, I would reverse and vacate Thomas's conviction for misprision of a felony.